Philip VALENTI, Betty Clift, Dorothy Ferebee, Eric Bradway, and Stuart W. Kessler, Plaintiffs,

v.

Brenda K. MITCHELL, Secretary of the Commonwealth of Pennsylvania and William Boehm, Commissioner, Bureau of Commissions, Elections, and Legislation, Defendants.

Civ. A. No. 92–1680.

United States District Court, E.D. Pennsylvania.

April 3, 1992.

Samuel C. Stretton, West Chester, Pa., for plaintiffs.

Gregory E. Dunlap, Deputy Gen. Counsel, Com. of Pa., Gwendolyn T. Mosley, Senior Deputy Atty. Gen., Harrisburg, Pa., for defendants Mitchell and Boehm.

Mark A. Klugheit, Dechert, Price & Rhoads, Philadelphia, Pa., for Senator Specter.

## OPINION AND ORDER

GAWTHROP, District Judge.

This action stems from consequences of the last-minute litigation over the reapportioning of Congressional Districts in the Commonwealth of Pennsylvania. Plaintiffs ask for declaratory relief and for a preliminary and permanent injunction, alleging that the March 10, 1992, Order of the Supreme Court of Pennsylvania,[1] setting forth the new Congressional District boundaries and declaring March 19, 1992, the filing deadline for signature petitions for Congressional candidates and Presidential delegates, is unconstitutional under the First and Fourteenth Amendments of the United States Constitution. I have considered each plaintiff's case individually,[2]

---

1. The two pages salient to this opinion are appended.

2. At the hearing held on April 2, 1992, Plaintiffs' counsel made a motion to add Stuart W. Kessler and Louis J. Fanti as additional plaintiffs. Mr.

and after submission of briefs, oral argument, a hearing on the record, a supplemental hearing, and reargument, I am convinced that the March 10, 1992, Order of the Supreme Court of Pennsylvania infringes unconstitutionally on plaintiffs, Bradway's and Kessler's, freedom of association by placing an undue burden on their efforts to get on the ballot for the primary scheduled for April 28, 1992. As to Eric Bradway and Stuart Kessler, I shall, therefore, grant the request for a preliminary injunction.

## PROCEDURAL HISTORY

The court held a hearing on plaintiffs' motion for a preliminary injunction on March 30, 1992. On April 1, 1992, the court issued its opinion, finding the Pennsylvania Supreme Court's Order unconstitutional and granting a preliminary injunction as to all plaintiffs. On April 2, 1992, during a hearing on the record, the Attorney General petitioned the court to reconsider its decision and supplemented the original record with facts not brought to the court's attention during the March 30th hearing. Because the court had based its previous opinion on some misapprehensions of and omissions in the evidence, I today vacated my order and withdrew my opinion of April 1st. Having reconsidered this case upon the corrected and supplemented record, I now issue an amended opinion and order.

## FACTUAL BACKGROUND

Because of population changes in the Commonwealth of Pennsylvania, documented by the decennial census, the congressional districts had to be redrawn for the 1992 primary, to be held April 28, 1992. Since, however, the Pennsylvania General Assembly could not agree on the new congressional district boundaries, litigation

erupted over how these new districts were to be drawn. Litigation was still going on when candidates for the House of Representatives and party Delegates to the National Conventions were allowed to begin gathering signatures on their nomination petitions. Pennsylvania's Election Code provides that "[n]o nomination petition shall be circulated prior to the thirteenth Tuesday before the primary, and no signature shall be counted unless it bears a date affixed not earlier than the thirteenth Tuesday nor later than the tenth Tuesday prior to the primary." 25 P.S. § 2868. The thirteenth Tuesday before the primary was January 28, 1992. On that date, since no congressional districts had yet been drawn, the Bureau of Elections, at midnight, declared that no congressional districts existed, and stayed the circulation of petitions for congressional candidates and for party presidential delegates, until the boundary lines (which, for the delegates as well, coincide with Congressional districts) were settled.

On March 10, 1992, the Supreme Court of Pennsylvania filed an order in which it adopted a reapportionment plan, recommended by President Judge Craig of the Pennsylvania Commonwealth Court, which set out the new Congressional Districts. That order was filed between 4:30 and 5:00 p.m. on Tuesday, March 10, 1992. In the Order, the Court set a revised schedule for circulating nominating petitions, providing that March 10 was the first legal day to circulate petitions and March 19, 1992 was the last day to file petitions. The petitions had to be filed by 5:00 p.m. with the Bureau of Commissions, Elections, and Legislation ("the Bureau") in Harrisburg. The Order provided that all signatures on the Nominating Petitions obtained prior to March 10, 1992, were void.

Kessler was similarly situated with the other plaintiffs and came forward when he heard of this lawsuit. He has pending in the Pennsylvania Supreme Court, a petition asking that the Bureau of Commissions, Elections, and Legislation accept his petition without the required number of names. To his knowledge, as of April 2, 1992, the Supreme Court had taken no action on his petition. Since the Supreme Court

has not yet ruled on his petition, I am not barred by the *Rooker–Feldman* doctrine, *see* n. 5, *infra,* from adding him as a plaintiff. However, in the case of Mr. Fanti, the *Rooker–Feldman* doctrine and the Third Circuit's holding in *Blake v. Papadakos,* 953 F.2d 68, 73 (3d Cir.1992), limit his recourse to challenging this adjudicative act of the state's highest court is in the Supreme Court of the United States.

The only provision in the Order for notice of the filing deadlines was in its attached schedule. It provided that county boards of elections publish, on March 17, 1992, a notice in the newspapers, stating that candidates for Representative to Congress would be nominated and the party offices of Delegate to the National Convention would be elected on April 28, 1992. It also required that the March 17th notice specify that the Court had established a deadline of March 19, 1992 for the filing of nomination petitions for these offices. In addition, the Court ordered, to give notice to the public, that "the Secretary of the Commonwealth shall, as soon as possible, publish in the *Pennsylvania Bulletin*, by the description, and if feasible, by maps, the new Congressional Districts." 22 *Pennsylvania Bulletin*, 1253 (March 21, 1992). The Order, including the circulation period, filing deadline, and descriptions of the Congressional Districts, was not published in the Pennsylvania Bulletin until March 21, 1992. Thus, the official notice of the filing deadline was not officially published until two days after the filing deadline had come and gone.

Monna Accurti, legal assistant for the Bureau of Commissions and Elections, testified that she picked up the court's order at about 5:00 on March 10, 1992, after receiving a call that it had been filed. That evening she called the state Republican and Democratic Committees. She testified that she tried some of the Presidential candidate campaigns, but could not reach them. Some she reached on March 11th. Also on March 11th, the Bureau mailed a written notice to the Presidential candidates and to congressional candidates who had picked up signature petitions at the Bureau. She could not reach delegate candidates because they had to pick up the petitions from the presidential campaigns themselves.

Pennsylvania requires a candidate for the House of Representatives to collect 1,000 signatures and requires a candidate for Presidential delegate to obtain 250 signatures in order to get his or her name on the ballot. These signatures must be from registered voters in the party and in the Congressional District for which the candidate is seeking to be a nominee or a delegate. 25 P.S. § 2872.1. Since 25 P.S. § 2868 provides for a petition circulation period of 21 days, elections in years past have provided candidates 21 days in which to gather their required number of signatures. The Court's Order setting forth the circulation period as March 10th through March 19th, having been filed towards 5:00 p.m. on March 10th, effectively allowed only 8½ days, since the petitions had to be filed in Harrisburg by 5:00 p.m. on March 19, 1992. To that incontrovertible temporal fact the Attorney General stipulates.

Four plaintiffs in this action[3] are persons who wanted to be on the ballot, but are not because they could not gather the requisite number of signatures in the time frame allowed by the Court's March 10, 1992, Order. Eric Bradway is a registered Democrat, living in Gladwyne, who desires to represent the 13th Congressional District as a delegate committed to presidential candidate Jerry Brown. He filed a written notice with the Brown campaign, according to the rules of the Democratic Party, and asked them to keep him informed of when he could start circulating petitions, since he was aware that litigation had indefinitely stayed the statutory circulation period. He did not find out about the Court's March 10th Order until around 3:00 in the afternoon on March 17th, when someone from the Brown campaign called him. He thought it nearly impossible to organize and collect the required 250 signatures in 1½ days, and thus, "threw up his hands" and did not attempt to gather any petition signatures.

Stuart Kessler is a citizen of Pennsylvania and lives in Plymouth Meeting. He wants to run in the 13th Congressional District as a candidate in the U.S. House of Representatives in the Republican Primary.

---

**3.** At the hearing on March 30, 1992, plaintiffs' counsel represented that plaintiff Sara Nichols had decided to withdraw her candidacy for Congress, and was thus, withdrawing as a plaintiff in this case. The court did grant, however, plaintiffs' unopposed motion to add Eric Bradway as an additional plaintiff.

He knew of the litigation over the congressional redistricting, but did not find out about the March 10th Order until he received, on March 13, 1992, the written notice of the Court's Order and the Election schedule, sent out by the Bureau. The notice contained no description or map of the new congressional districts. He tried to call different sources to find out the exact boundaries of the districts, but was told only that it was most of the old 13th district. He started right away, on March 13th collecting signatures, and mobilized friends, family, and colleagues to help with the petitions, even though he was not sure of the exact boundary lines of the district. He collected over 500 signatures of the required 1,000, and filed those petitions with a filing fee in Harrisburg by the deadline, March 19th. The Bureau accepted 496 of those signatures, but refused Mr. Kessler a place on the ballot because he had not collected the requisite 1,000 signatures.

Dorothy Ferebee is a registered Democrat wishing to run in the Democratic primary to represent the 2nd Congressional District as a delegate committed to Lyndon LaRouche. She found out about the notice on March 11th, by telephone call from someone in the LaRouche campaign, but had only collected 85 signatures, out of the required 250, by the filing deadline of March 19, 1992. Betty Clift is a citizen of Pennsylvania and a registered Democrat in the 16th Congressional District. Before March 10th, she resided in the 5th Congressional District, which for 1992 election purposes is now abolished. She wants to be on the ballot for the Democratic primary for the House of Representatives, but had only some 202 signatures, out of the required 1,000, by March 19, 1992.

The other plaintiff, Philip Valenti, is a citizen of the Commonwealth of Pennsylvania and a candidate for the U.S. Senate.[4] He is also the authorized representative of Lyndon LaRouche in Pennsylvania. Lyndon LaRouche is already on the ballot as a Presidential candidate in the Democratic Primary. He is currently incarcerated,

however, in the Federal Medical Center of Rochester, Minnesota, serving a fifteen-year sentence. Under 25 P.S. § 2867, nominating petitions for presidential delegates have to be signed by the candidate to which they are pledged. Defendant William Boehm, Commissioner of Elections, sent a letter to Mr. Valenti, however, stating that his office would accept as meeting the requirement of 25 P.S. § 2867,

> a list of all persons running as delegate or alternate delegate to the national convention whom you have approved as committed to your candidacy. This list must be organized by congressional district with the names of delegates and alternate delegates arranged in alphabetical order, including addresses, in the appropriate district. A cover memorandum in the form of an affidavit should be attached to such list certifying that the information contained on the list is true and correct. *We will accept no nomination petitions from delegates committed to your presidential candidacy until this list is filed* in our office.

The affidavit to be used was enclosed and required the signature of the presidential candidate.

Since the congressional districts were undecided before March 10, 1992, this list could not be prepared until the boundaries of the new districts had been drawn. The National Ballot Access Coordinator for Lyndon LaRouche, Marla Minnicino, lives in Virginia, and testified that she received word of the Court's order on March 11, 1992. By March 13, 1992, she had received the revised list of delegates in their appropriate new districts. Someone from the LaRouche campaign flew the list to Rochester, Minnesota, on Sunday March 15, and mailed the list to LaRouche from there on March 16, 1992. It is unclear from the record whether the list was mailed directly from inside the Federal Medical Center where LaRouche is incarcerated or from elsewhere in the city. In any event, these rather elaborate procedures are made nec-

---

**4.** Mr. Valenti could not appear at the hearing on plaintiffs' motion, because he was debating oth-

er candidates in Harrisburg on March 30, 1992.

essary by Federal Bureau of Prison regulations that prohibit prisoners from receiving overnight or express mail. They cannot receive faxes unless sent or ordered by the court, and they cannot receive hand deliveries, unless the person delivering the documents is a legal assistant or a lawyer, which this LaRouche campaign person was not. Mr. LaRouche does not have an authorized representative in the state of Minnesota with whom he is in regular contact. Although the date that Mr. LaRouche received the list is not in the record, he signed it and mailed it on March 20, 1992, to Harrisburg. Some of the delay, if there was any, may have been caused by the fact that the affidavit accompanying the list had to be notarized, and notary services may not have been readily available to Mr. LaRouche as soon as he would have liked.

In the meantime, since the people running the LaRouche campaign in Pennsylvania realized that the shortened time period for filing petitions would make it unlikely that LaRouche could return his list of delegates by the March 19, 1992, deadline, Phil Valenti signed a copy of the list as an authorized representative for Lyndon La-Rouche and filed it in Harrisburg on March 19, 1992. By a March 19, 1992, letter, however, defendant Boehm notified Mr. Valenti that since he did not receive a delegate list, signed by the candidate personally, by the March 19, 1992, deadline, the delegate petitions received for Lyndon La-Rouche would be rejected as committed delegates. They would, however, be accepted as uncommitted delegates. The re-

sult is that, at this time, there are no delegates committed to Lyndon LaRouche on the ballot for the Democratic primary in Pennsylvania.

## DISCUSSION

1. *Constitutionality of the schedule set out in the March 10, 1992 Supreme Court Order*

Before addressing what is at issue here, it is well to remember what is not at issue. Preliminarily, this case is not precluded from judicial consideration because of its being fundamentally a political question. The justiciability of voting and redistricting issues was long ago resolved, and the law is clear that this is an area that may properly be considered by the courts. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *U.S. Department of Commerce v. Montana,* — U.S. ——, 112 S.Ct. 1415, 1416, 118 L.Ed.2d 87 (1992).

■ Nor is this a question of considering the constitutionality of a Pennsylvania statute. Contrary to the contention of plaintiffs, the statute in question, 25 P.S. § 2868, does not give a prospective candidate 21 days in which to circulate a nominating petition. Rather, it sets a maximum of time, the optimum temporal window within which one may circulate petitions. Yet the statute does not say that time may not be abridged. Further, what is ultimately at issue is not the statute, but rather, the order of the Supreme Court of Pennsylvania and the way it was published and implemented.[5] It should be noted,

---

**5.** Although no one has challenged this court's jurisdiction to review the Supreme Court of Pennsylvania's action here, out of an abundance of caution, I briefly treat that issue. While the federal district court does not ordinarily have jurisdiction to review the final decisions of a state's highest court, under the *Rooker–Feldman* doctrine, the district court does have jurisdiction to hear constitutional challenges to non-adjudicatory acts of the state supreme court. *Blake v. Papadakos,* 953 F.2d 68, 72 (3rd Cir. 1992), *citing District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 483 n. 16, 103 S.Ct. 1303, 1315 n. 16, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). Thus, the court's jurisdiction depends upon whether the proceed-

ing is adjudicative or non-adjudicative. In making this distinction, "[t]he form of the proceeding is not significant. It is the nature and effect which is controlling." *Blake, supra,* at 73 (citations omitted). "[A]djudicative acts involve the application of existing laws to the facts in a particular case." *Id.,* at 72, whereas, "administrative/non-adjudicative acts, generally require not the application of existing laws to particular acts but rather 'look[ing] into the future and chang[ing] existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *Id.,* at 72.

Here, the Pennsylvania Supreme Court was promulgating a schedule and map for the conduct of general elections in the future. This act is a quintessentially administrative, non-adjudi-

therefore, that the traditional deference accorded by courts to legislative decisions because of the legislature's function in weighing competing considerations and adopting measures in the public interest is, respectfully, not due in this situation where I am asked to review a court order rather than a statute. *Cf. Trinsey v. Commonwealth*, 941 F.2d 224, 233–235 (3d Cir.1991) (challenging the special election procedures of 25 P.S. § 2776).

Nor am I, in deciding this case, in any way wishing to intrude federally upon the sovereign Commonwealth of Pennsylvania, in its exercise of its right under Article I, Section IV of the United States Constitution,[6] to fashion an appropriate approach to orderly election of federal offices. Generally, states may exercise wide discretion in regulating elections to protect legitimate state interests. *See Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1982); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Election procedures are, absent constitutional abuse, quite properly left to the states; yet these powers granted to the States are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution. *Williams v. Rhodes*, 393 U.S. 23, 29, 89 S.Ct. 5, 9–10, 21 L.Ed.2d 24 (1968).

Also, in assessing the federal constitutionality of the Supreme Court's order, I approach the case with full recognition that the task of redistricting the Commonwealth is a daunting one, indeed. The arithmetical and geographic considerations, in and of themselves, are the epitome of complexity. The human, political considerations are also compelling, and those concerns are compounded when command of the census is that Pennsylvania lose two of its congressional seats, dropping from 23 to 21 districts. The practical realities of the political free-for-all in the context of trying to achieve comportment with the one-person, one-vote command of *Baker v. Carr, supra*, and its progeny, presents a task the conquest of which is no mean feat.

In approaching the constitutional concerns, I do not view the case as turning particularly on the equal protection clause of the Fourteenth Amendment to the United States Constitution. The plaintiffs suggest that because the candidates for the House of Representatives and presidential delegates are treated differently from the other candidates, such as the United States Senate, and the Pennsylvania House and Senate candidates, there is invidious discrimination, in violation of the Equal Protection Clause. That argument disregards reasonable bases for the distinction. The geographic confines of the senatorial districts, of course, remain constant, since the metes and bounds of the Commonwealth of Pennsylvania, every square inch of which is represented by each senator, do not vary from decade to decade. With respect to the Pennsylvania House and Senate seats, the disputes over the configuration of those districts apparently were settled some time ago, so that candidates for those positions were not kept in the dark, placed under the temporal gun the plaintiffs at bar have had. Rather, it is just the congressional redistricting that remained unresolved until the very end, ultimately being required to run its full litigious course through the courts of the Commonwealth of Pennsylvania, and, indeed, today pending before the federal judiciary. Since cases involving other elected offices were resolved more quickly, or were never brought to litigation, the particular elected offices in the case at bar were treated differently. The distinction is reasonable and understandable, not unlawfully discriminatory, invidiously or otherwise.

Although this case will not turn, in my view, on Equal Protection concerns, the

---

catory act. The order is drafted in the most open-ended, general way, the hallmark of legislative as opposed to judicial functions. Since the challenged order is of a non-adjudicatory nature, the federal court has jurisdiction over this challenge to its constitutionality.

6. Article I, § 4 of the U.S. Constitution provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."

hint of an equal protection violation does perhaps appear, when one observes that the notification procedures which took place here involved the electoral powers-that-be in Harrisburg, immediately notifying members of the two main political parties, Republican and Democratic, by telephone, but not notifying any other political entities, prospective candidates, or the public at large. Rather, any notice as to the March 10th order was done principally to the two main parties, with little concern for apprising anyone else in the Commonwealth who might be interested in running for these offices. That treatment, although perhaps understandable, does nevertheless bear the hallmark of the unequal. Despite that unequal, disparate treatment, I find that the case turns, instead, on a First Amendment right: the freedom to associate.[7]

## 2. First Amendment

The U.S. Supreme Court in *Williams, supra,* determined that ballot-access restrictions burden two different, though overlapping, rights—

the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights of course, rank among our most precious freedoms. We have repeatedly held that freedom of association is protected by the First Amendment. And of course this freedom, protected against federal encroachment by the First Amendment, is entitled under the Fourteenth Amendment to the same protection from infringement by the States.

*Id.* 393 U.S. at 30, 89 S.Ct. at 10. Ballot access restrictions affect candidates, but also have at least some correlative effect on voters by limiting the "field of candidates from which voters might choose." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972).

Although these rights of voters and candidates are fundamental, not all ballot access restrictions imposed by the States are constitutionally suspect. The Supreme Court, in *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971), held that the state has the undoubted right to require candidates to make a preliminary showing of substantial support. States can achieve this objective by requiring candidates to demonstrate such support through the collecting of a statutorily prescribed number of signatures by a statutorily prescribed time. Courts that have looked at state requirements to collect a number of signatures in a specified time period have been focused most often upon challenges to the signature numerosity, the time allowed to collect being not irrelevant, but ancillary. In these cases, courts have generally been called upon to construe state statutes setting a signature requirement equal to a certain percentage of votes cast in the last election.

In *Storer v. Brown,* 415 U.S. 724, 728, 94 S.Ct. 1274, 1278, 39 L.Ed.2d 714 (1974), a California statute [8] required an independent candidate for President to file a petition signed by 5% of the total number of votes cast in California at the last general election. The Court found that a requirement, which amounted to gathering 325,000 signatures over 24 days was not *per se* unconstitutional. It remanded the case to the district court, however, to make sure that the pool of qualified voters was not substantially smaller than the total vote in the last election,[9] requiring, in reality, signatures of substantially more than 5% of the eligible pool to get the required number of signatures. Four years later, in assess-

---

7. It is well to remember that the First Amendment embraces more than the familiar areas of speech, press, and religion. It fully reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

8. California Elections Code § 6831 (1961).

9. Another California law disqualified from signing the independent's petition all registered voters who voted in the primary.

542

ing the California statute, amended after the *Storer* decision to require an independent candidate to collect within 60 days, 1% of the total number of votes cast in the last general election, the court in *Cross v. Fong Eu*, 430 F.Supp. 1036 (N.D.Ca.1977) upheld its constitutionality in requiring approximately 100,000 signatures within that two-month period.

In *Perry v. Grant, et al.*, 775 F.Supp. 821 (M.D.Pa.1991), plaintiff, a candidate of the U.S. Taxpayers party, challenged the Pennsylvania statute, 25 P.S. § 2911, which required an independent party candidate seeking a position on a special election ballot to file nomination papers bearing signatures of at least 2% of the qualified electors who voted for the winning candidate in the last state-wide election. Perry, who wanted to run for the U.S. Senate seat left vacate by Senator Heinz's untimely and tragic death, had to collect 41,305 signatures within 149 days, requiring an average of 277 signatures each day. The court upheld the constitutionality of the statute as a reasonable burden on those wishing to be candidates for office. In *Williams v. Tucker*, 382 F.Supp. 381 (M.D.Pa.1974), the court construed the same "two-percent" rule statute and found it constitutional. There, the Commonwealth's calculation required that an independent candidate for U.S. Representative collect 2,452 signatures within the statutory period of 21 days, 25 P.S. § 2913.

While it is true that courts have upheld signature requirements seemingly more burdensome than 1,000 signatures over 8½ days, the plaintiffs here are not challenging the numerosity or time allowed, per se. Rather, the question is whether all the surrounding circumstances present so abridged a practical duration as to constitute an unconstitutional abridgement of that First Amendment right. In analyzing this situation, the case does not turn principally on the shortness of time. As for the 8½ day time factor, I need not and do not address whether it, in and of itself, would be long enough to get the petitions signed. Instead, I evaluate the entire scenario to determine whether the citizenry had the

right, the knowing right, to get their names on a ballot and run for these offices.

In approaching that task, I note that although the Supreme Court has used varying tests in assessing the constitutionality of ballot access restrictions, they all involve a basic balancing test. In *Anderson v. Celebrezze, supra*, the Court determined that courts considering these matters must

first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. *Id.* at 789.

I consider these criteria in turn.

a. Character and Magnitude of the Injury

In considering the character and magnitude of the asserted injury to the right of association under the First and Fourteenth Amendment, it is well to recall the observation of Justice Black, speaking for a majority of the United States Supreme Court in *Williams v. Rhodes, supra*, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* 393 U.S. at 31, 89 S.Ct. at 10 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 491 (1964)). Hence, I conclude that the character and the magnitude of the injury is immense.

b. State's interests

The state asserts that the shortened circulation period and filing deadline were adopted in order to provide for an orderly election process. It points out that the shortened time period serves legitimate state interests by ensuring that "the pri-

mary elections for candidates for United States Representatives and national convention delegates are held as scheduled on April 28, 1992; ensuring that candidates for Representatives and convention delegates reflect newly drawn boundaries which are fair and equitable; preventing an overcrowded ballot; and protecting the integrity of the party system. Taking the last first, the Supreme Court's schedule, adopting the circulation period and providing for notice on March 17th, does protect the integrity of the party system, in that it discourages candidates who are not connected with the mainstream of the two political parties from trying to appear on the ballot. On the other hand, while I recognize a need to prevent the proliferation of splintering factions, protecting the integrity of the party system means more than protecting the virtual monopoly of the two traditional parties. At the heart of the electoral process, is the right to citizens to express their different viewpoints by trying to get someone to represent them as a candidate.

As to the state interest in preventing overcrowding of the ballot, the Supreme Court's Order certainly accomplishes that. The question is, however, whether the piecemeal, word-of-mouth notification procedures does it fairly and sufficiently to pass constitutional muster. As to candidates representing congressional districts that are fair and equitable, that issue is not before me, but is even now pending before a three-judge panel of this circuit. The plaintiffs do argue, however, not without some basis, that it is not fair and equitable to spring on them a short schedule such as this one, without some reasonable advance notice of the size and location of one's district—which, and where, it is.

The effort to hold a timely election is the principal state interest that is genuinely served by the time deadlines in Supreme Court's Order.

### c. Balancing of Interests and Injury

■ In inquiring whether the shortened time period and lack of notice "unfairly or unnecessarily burdens the availability of political opportunity," *Anderson v. Celebrezze, supra,* 460 U.S. at 793, 103 S.Ct. at 1572, I turn to the question of notice. In *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972), albeit in another procedural context, the Supreme Court of the United States stated that notice must be given in at a meaningful time and in a meaningful manner. In this case, the Supreme Court of Pennsylvania expressly directed that notice of the cutoff date and time for filing petitions as March 19, 1992, at 5:00 p.m. in Harrisburg, was to be published in newspapers, presumably so that the public would be aware of the filing deadline—on March 17, 1992.[10] The defendants argue that the official publication has no relevance to petition-filing deadlines, but rather is done purely for the purpose of apprising the voters of the date of the forthcoming election and the configuration of their new congressional districts. But that argument is belied by the very terms of the contents required to be published: "such notice [meaning the one to be published March 17, 1992] to specify that the Court has established a deadline of March 19, 1992 by which nomination petitions for such offices must be filed."

It is so obvious as to need no discussion, but so significant that it may not go undiscussed: March 17th to March 19th is a short time—two days.

There are many precedents regarding signature requirements, which I have considered, *supra,* and discussed at some length. Those cases must be considered in the context of the total time span which the prospective candidates were accorded. When a candidate is given, for example, 149 days in which to get a certain, rather large number of signatures, such as 41,305

---

**10.** There were no newspaper stories introduced into the record, containing word of the March 19, 1992, filing deadline before March 17, 1992. Two defense witnesses, Dennis Kelly, and Karen Axe, who work in the county boards of election of Philadelphia and Lancaster Counties, respec- tively, both testified that they sent the notice of openings for nominations and candidacies, that included notice of the March 19th filing deadline, to newspapers to publish on March 17, 1992, as mandated by the Supreme Court's schedule of March 10, 1992.

or 277 per day, as in *Perry v. Grant, et al., supra,* 775 F.Supp. at 826, a candidate has some lead time in which to organize his or her supporters, to determine the clearly delineated dimensions of the electoral district within which the signatures could be sought, to get geared up for action, and to get the petitioning task accomplished.[11] Realistically, there needs to be some preparatory time, some organizational time, as well as some actual soliciting time, when the petition seekers go door to door, shopping center to shopping center, street corner to street corner, or whatever. Here, with the geographic perimeters of the districts, together with the official cutoff time, sprung on the potential candidates at the eleventh hour, they simply are not given a realistically reasonable time.

The fact is that all citizens—assuming appropriate age and other such qualifications,[12] have the right to run for office, not just those who are in the inner circles of the two major parties. The process of haphazard notification combined with the shortened time period would naturally impact more severely on parties or candidates who do not have big-party resources ready to step into action. It may take candidates who represent minority views, or delegates who represent not-well-known candidates, somewhat longer to attract people to their cause and to obtain signatures. And it certainly affects members of the general public who may have contemplated running, but were waiting to see the results of the redistricting, and who did not find out until the order was published in the newspaper, two days before the filing deadline.

The Pennsylvania Supreme Court Order expressly delayed the official newspaper notification date for an entire week, until roughly 80% of the already truncated time had gone by. In its revised election calendar, the "as soon as possible" language, used to refer to the Pennsylvania Bulletin, was omitted, and instead, that March 10th order directed that the

County Boards of Election publish a notice in newspapers that nominations of candidates or Representatives in Congress will be made, and that elections of persons to the party offices of Delegate and Alternate Delegate to National conventions of the political parties will occur at the April 28, 1992, General Primary, such notice to specify that the court has established a deadline, March 19, 1992, by which nomination petitions for such offices must be filed.

At oral reargument, counsel for the defendants stated that the reason for the delay until March 17th for this publication was that newspapers need considerable lead time in order to get these matters in the paper. Apparently, a week was deemed sufficient. Although I have no personal knowledge of how much lead time newspapers need to publish, and no specific evidence was adduced on that point, I must say that I have grave difficulty with the suggestion that a week is needed in order for a newspaper to publish. This is the information age. The wonders of the facsimile machine, photocopying, desk-top publishing, electronic mail, electronic, automated typesetting, and all the other new technological communications marvels never cease to amaze. One need not be a professional publicist to contemplate the ways in which this information could have been broadcast. Many people who work for the Commonwealth of Pennsylvania could have been commandeered to get out the word. Pennsylvania State Police come to mind. Election Boards cover the Commonwealth from Lake Erie to the Delaware, and they could have been put into prompt action. But to delay the formal announcement of this very, very significant political event— the proclamation of new Congressional Districts and the filing deadlines for petitions to get on the ballot to run for the House of Representatives and as presidential delegates in those Districts—presents a situation which I simply cannot justify under the Constitution. I am asked to decide

---

**11.** So also, most of the cases involved larger, electoral areas, such as California, so that more people can be solicited to sign.

**12.** It appears that one's federal incarceration does not disqualify one from running for President.

whether the notification delay is so great as to cut off these plaintiffs' constitutional rights to associate with the parties or the candidates of their choice. I am constrained to conclude that it does.

This conclusion is reinforced when one observes that, for various reasons, the official legal notice of the March 10th Order was not published in the *Pennsylvania Bulletin* until March 21st, two (2) days after the filing deadline. The obviousness of the untimeliness of that is self-evident. The *Pennsylvania Bulletin* is the preeminent device for publishing documents, to give notice to the public of official happenings and documents. *See* 45 Pa.C.S. §§ 724–725. At oral reargument, counsel for defendants warranted that the principal reason was that official documents to be published in the Bulletin have to be deposited with the Legislative Research Bureau 10 days before the publication date of the Bulletin in which the document is to run. Apparently, that lead time is said to be immutable, although the Supreme Court in its order commanded that the Secretary of the Commonwealth publish "as soon as possible" the bounds of the new congressional districts. Apparently, the prospect of a special edition, to permit official publication of the deadline notice before the deadline had passed—rather than after—was beyond contemplation. Established procedures are not to be bent or broken, no matter what the exigency.

Sir Edward Coke's aphorism, "[T]he knowne certaintie of the law is the safetie of all," Lord Coke, *Institutes* 395 (12th ed. 1738) (Epilogue to Pt. 1, Bk. 3), is oft cited with approbation. *See Frilette v. Kimberlin*, 508 F.2d 205, 219 (3d Cir.1974); *Kratz v. Kratz*, 477 F.Supp. 463, 483 (E.D.Pa. 1979). What happened in this case is that the concatenation of events, from the late-in-the-day filing on March 10th, to the late-in-the-time-period notice of March 17th, when the order was permitted, by its own terms, to go public, to the after-the-deadline official publication in the Pennsylvania Bulletin, is that the public at large was visited with the unknowne uncertaintie of the law. That is not right. The public has a right to know its rights, and to keep the public in the dark so long that its rights can realistically be exercised only in theory, because of the slender sliver of time left to breathe vitality into their exercise, is to suffocate those constitutional rights into extinction.

The Pennsylvania Supreme Court could have made some provision in its order either for immediate notification and publication, for a lag time before the circulation period began, or for a longer circulation period. Any of these options could have accommodated the state's interest in holding a scheduled election on time and its orderly preparation without unnecessarily burdening potential candidates, and in particular, these plaintiffs.

▮ In assessing the burden imposed by the Supreme Court's shortened circulation period and filing deadline and the lack of adequate procedures to notify those wishing to be on the ballot, I must look at each plaintiff's particular situation. I note at the outset, that Betty Clift and Dorothy Ferebee were in fact unaffected by any delay in receiving official notice of the Order, for they had actual knowledge. Betty Clift found out about the March 10, 1992, order that evening, and Dorothy Ferebee found out sometime the next day, both by a telephone call from someone in the La-Rouche campaign. Although actual knowledge does not excuse failure to give notice, *see Gooch v. Oregon Short Line Railroad Co.*, 258 U.S. 22, 25, 42 S.Ct. 192, 193, 66 L.Ed. 443 (1922), it may, in certain circumstances, cure defective notice. To hold otherwise, would be, as the Third Circuit has noted in an analogous situation, to "place form over substance." *Pothering v. Parkson Coal Co.*, 861 F.2d 1321, 1329 (3d Cir. 1988); *Accord Roman Ceremanics Corp. v. Peoples National Bank*, 714 F.2d 1207, 1214 (3d Cir.1983); *Bridgewater Borough v. Pennsylvania Public Utility Commission*, 181 Pa.Super. 84, 123 A.2d 266 (1956) (one has notice of a fact if he knows the fact). In addition, although Betty Clift knew about the Order on March 10th, she did not actually attempt to gather any signatures until March 17, 1992; and although Dorothy Ferebee knew on March 11th of

the Order, she did not attempt to collect signatures until March 16, 1992.[13] They testified that their own and their helpers' work schedules largely prevented them from getting out to collect signatures, yet they waited several days to get started. These candidates' actual knowledge combined with their own late start leads me to conclude that the onus for their failure to get on the ballot ultimately must be borne by them. Equity aids the vigilant, not those who rest on their rights. Thus, I shall not extend the filing deadline for these two candidates.

■ Eric Bradway presented compelling testimony of how late notification on March 17, 1992, of the dates of the circulation period and filing deadline so discouraged him in his intention to run as presidential delegate for Jerry Brown that he "threw up his hands," deeming it impossible to collect 250 signatures in one and one half days. Stuart Kessler, also, explained how once he found out about the Order on March 13, 1992, he started gathering signatures, despite his uncertainty as to the district boundaries. He testified that he was able to gather about 500 signatures in some six days, but despite his best efforts, with no advance warning of the deadline or the shortened circulation period, he could not collect the 1,000 required signatures in less than one third of the time (21 days) generally allowed. These two candidates were truly burdened unconstitutionally by the March 10th Order; thus, their time to file will be extended.

As to Philip Valenti and the untimely filing of the list of delegates committed to LaRouche, the circumstances of LaRouche's incarceration and the March 19th deadline for filing, announced by the court on March 10, 1992, made it virtually impossible for LaRouche to file his list with his signature on time. In any event, the defendants have now acquiesced in his aspect of the prayer for a preliminary injunction.

When one boils down, no doubt simplistically, the electoral process, one comes up with an exercise which is essentially fourfold. First, eligible citizens, upon recognizing that, within a certain electoral district, there is a governmental position to be won by election, recognizing that they have a certain finite, specific period of time in which to accomplish the procedures to get on the ballot, do that, and get themselves placed on the ballot. Second, once on the ballot, they go about that district personally and with the help of surrogates, publicity literature, and other media, to convey their positions to the voters and to seek votes. Third, the people vote. In so doing, they almost invariably vote only for people on the ballot, experience having shown that write-in candidates are exercises in the quixotic. Fourth, those votes are counted, honestly and accurately, and the winners declared.

If any of those steps is so stifled or diminished as to make it but lip service to that step of the democratic exercise, the total process is fatally flawed. In my view, the abbreviation of the electoral period, together with all the surrounding circumstances, involving uncertainty as to what the finally arrived-upon electoral districts were, as well as non-information as to when the petitions to get on the ballot were due, fatally, constitutionally, flawed the first step in the process.

2. Appropriateness of an Injunctive Remedy

■ Although I recognize that the granting of an injunction is an extraordinary remedy, I find that it is here required. An injunction will only be granted in plaintiff can demonstrate 1) the reasonable probability of eventual success in the litigation and 2) that the movant will be irreparably injured if relief is not granted. The court should also consider 3) the possibility of harm to other interested persons from the grant or denial of the injunction, and 3) the

---

**13.** Both of them continued to collect signatures through the date of the hearing, March 30, 1991, March 31st being the 21st day from the date of the order. Dorothy Ferebee had collected about 300, exceeding the required 250, and Betty Clift had collected about 820, coming very close to the required 1,000, one and ½ days before they would have been filed, using a 21 day circulation period.

public interest. *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 634 (3d Cir.1991).

I have assessed plaintiffs' likelihood of success on the merits in this constitutional challenge in Part I of this opinion, which I here incorporate. Having found the Supreme Court Order an unconstitutional burden to ballot access, I conclude that plaintiffs have carried their burden of proving likelihood of success on the merits.

As to the requirement that the plaintiffs prove irreparable harm, defendants argue that a hopeful candidate's being denied access to the ballot is not harm, irreparable or otherwise. As I noted in my above discussion on the constitutionality of the Order, the caselaw and common sense lead me to conclude the exact opposite. Plaintiffs have carried their burden of proving irreparable harm.

In considering the third factor—harm to others—I do conclude that some degree of harm would befall the defendants were I today to grant an injunction. One is the possible disenfranchisement of absentee and military voters. Frederick Voigt, in his capacity as the Executive Director for the Committee of 70, works with Philadelphia election officials in preparing for and monitoring the election, and he testified that if the candidate list remains indefinite past Monday, April 6, 1992, Philadelphia County will have a very difficult time getting the ballots out to absentee and military voters.[14] By statute, 25 P.S. § 3146.6, absentee ballots must be voted by the elector no later than 5:00 on the Friday before the election—here, April 24, 1992. The Supreme Court's Order revised the last date on which the ballots could be received

to May 8, 1992, but left untouched the date on which the ballots must be voted. This could create a tight time window, in which the candidates' names need to be finalized, the ballots printed, mailed, voted, and received, that may disenfranchise some voters.

In addition, defense witnesses from Philadelphia and Lancaster County Boards of Election testified on Monday that much of the ballot and voting-machine preparation is started, and some of it half-finished. Both witnesses did state, however, that, if so ordered by the court, they could change the ballots and still complete preparations in time for the election on April 28, 1992. Although it could be costly and more than a little inconvenient, it could be done, as it has been many times before.

Counsel for defendants has come forth with a suggestion, not entirely *in terrorem*, that an adjudication of unconstitutionality means that they will have to cancel the election, the reason being that it will cause scores of other disappointed, unsuccessful petitioners to come forth, claiming that they, too, had insufficient time to get the requisite number of signatures, and that they, thus, should be let on the ballot as well. If counsel's predictions come to pass, the election may indeed have to be postponed until sometime in May.[15] Of that possibility I am mindful, but I am also mindful that the issue before me is a narrow one, directed solely to applying the law to the facts of this particular case. With respect to the potential additional petitioner-plaintiffs, it should be noted that their cases—other than Mr. Kessler's, whom I have permitted to join as a plaintiff—are not before me.[16] One can only speculate at

---

**14.** The difficulty Philadelphia county may have is not an issue here, however, since Dorothy Ferebee, the only plaintiff residing in Philadelphia county has not been granted an extension of time to file. The court has no other testimony from any of the other counties as to the absentee ballot problem, since this issue was only brought to the court's attention at the second hearing.

**15.** It is interesting to note that May primaries are not unknown to Pennsylvania. On every year a general election is held, except in the year of a presidential election, the primary is

held on the third Tuesday in May. 25 P.S. § 2753.

**16.** Plaintiffs have filed on the morning of April 3, 1992, a list of potential plaintiffs, who move to join or intervene in the present action. I decline to broaden this case to include people who have not yet testified and of whose particular situations I know next to nothing, and I shall defer ruling on that at least until the defendants have been afforded an opportunity to respond. My ruling today encompasses only those people from whom I heard testimony and have already accepted as plaintiffs in this action.

this juncture as to who would seek federal-court, or other, redress in the wake of this ruling. But it is certainly not certain what would happen in those other inchoate cases. Those plaintiffs, for example, could find themselves out of court, under the doctrine of laches. Nor, under all the circumstances, can it be said with certainty what would be the full retroactive effect of today's finding of unconstitutionality. *See James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). I am only called upon to decide the rights of the specific litigants before me, and that I have done.

Because of the timing of when the case finally made its way to this court, it has been suggested, in effect, that I am presented with a *fait accompli,* which I dare not dislodge because of all the difficulties that would present. Although I am by no means oblivious—nor insensitive—to those potential difficulties, to accept that argument entirely would be to divest this court of its duty to decide the fundamental question of constitutionality. I cannot let the timing of this case—when it finally came to me—put this court so over a barrel, in effect, that it has no choice other than to do nothing.

If I deny the injunction, there would be obvious harm to those kept off the ballot, as well as to voters, since fewer, less-diverse viewpoints may be represented on the ballot. "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes, supra,* 393 U.S. at 32, 89 S.Ct. at 11. In deciding this motion, incidentally, it is not my task to concern myself with the validity or wisdom of any candidate's platform. That is for the people to decide.

The defendants suggest that the public interest, the fourth prong of the preliminary injunction analysis, will be best served by denying injunctive relief, thereby avoiding the inconvenience and expense the state would have to incur in changing the ballots and reprogramming the voting machines. I disagree. The public interest will be more adversely affected if an order

that unconstitutionally burdens the people's right to know of the requirements for candidacy and to express their viewpoints by running for office or supporting someone on the ballot, goes unremedied. Again, the public interest is served by ensuring that access to the government, through access to the ballot, is open to all.

There is a familiar figure of speech which is relevant here, but which is often misused: a Hobson's choice. Many people use the expression to describe a situation in which one is confronted with a dilemma, which, strictly speaking, is where one has two choices, equally unacceptable, neither particularly palatable. Although that sort of dilemma has been known to appear on a ballot or two in the annals of political science, it is not a true Hobson's choice. Rather, the true meaning of the term comes down to us from one Thomas Hobson, a seventeenth-century liveryman of Cambridge, England, who, when hiring out one of his horses, would always make his customer take the steed nearest the stable door. Thus, a Hobson's choice, in the proper sense of the term, is no choice at all, but one which has been pre-ordained—in his case, by the powers-that-be, or the power-that-was.

Although Hobson's-choice ballots have been the rule in certain totalitarian countries in years past, and even down to today, that approach has not been the tradition of this Republic and its heritage of vigorous democracy. The best interests of the public are not served by procedures, which serve to exclude ballot names to the point of avoiding the inconvenience of competition to the established mainstream.

Thomas Hobson is dead. If today's ballots were permitted to echo his precedent, so, too, would be democracy.

## APPENDIX

### SUPREME COURT

Robert J. Mellow, Senator, 22nd District, et al, individually and in their Official Capacities, Appellants v. Brenda K. Mitchell, Act-

ing Secretary of the Commonwealth, and William Boehm, Commissioner of the Bureau of Commissions, Elections, and Legislation, Department of State, in their Official Capacities only, Appellees: No. 7 M.D.Misc. Docket 1992

ARGUED: MARCH 7, 1992

### Order

*Per Curiam*

*And now,* this 10th day of March, 1992, pursuant to hearing held upon complaint, it is hereby *Ordered* as follows: ·

1. The Petition to Intervene filed on behalf of State Senator James C. Greenwood, Andrew L. Warren, Mark S. Schweiker, and Sandra A. Miller is granted. The Petition of Edward J. Wilkes, Jr., Barbara Frailey, William A. Wall, William M. Keim, III, Justus C. Barber, Patricia Anne Buard, and Russell U. McLaughlin for Leave to Intervene is granted.

2. The exceptions to President Judge David W. Craig's Findings, Recommended Decision, and Form of Order filed in this matter are dismissed.

3. Section 1801-A of the Election Code, Act of June 3, 1937, P.L. 1333, added March 3, 1982, P.L. 127. § 2, 25 P.S. § 3571, is hereby declared unconstitutional and its implementation for the purpose of conducting elections to the office of Representative in the United States Congress is hereby permanently enjoined.

4. Such elections, in the primary and general elections in the years 1992, 1994, 1996, 1998 and 2000 shall be conducted in accordance with the Congressional Election Districts described in Appendix A, attached to and hereby made part of this Order, and hereby adopted as the apportionment of the Commonwealth into twenty-one (21) Congressional Districts until the same shall be lawfully changed.

5. The schedule for the primary elections to be held April 28, 1992, for the election of Representatives to the United States Congress and for Delegates and Alternate Delegates to National conventions, shall be conducted by the Secretary of the Commonwealth and by all election officers within the Commonwealth in accordance with the Revised Election Calendar attached to this Order as Appendix B, and hereby made part hereof, to provide for an orderly election process.

6. In addition, the Secretary of the Commonwealth shall, as soon as possible, publish in the *Pennsylvania Bulletin,* by description and, if feasible, by maps, the Congressional Districts hereby adopted in Appendix A.

7. The members of Congress now in office shall continue in the office until expiration of their respective terms.

8. Vacancies now existing or happening after the entry of this Order and before the commencement of the terms of the members elected at the election of 1992 shall be filled for the unexpired terms from the districts formerly prescribed in Section 1801-A of the Election Code, Act of June 3, 1937, P.L. 1333, added March 3, 1982, P.L. 127, § 2, 25 P.S. § 3571.

9. In the event any municipality or part thereof should be omitted in the description of congressional districts in Appendix A, the municipality or part thereof shall be included as a part of the congressional district which completely surrounds it. Should any omitted municipality or part thereof be not completely surrounded by one congressional district, it shall become a part of that congressional district to which it is contiguous, or if there are two or more such contiguous districts, it shall become a part of that congressional district contiguous thereto which has the least population.

10. All signatures to nominating petitions for candidates for Representative in the United States Congress, and candidates for Delegate and Alternate Delegate to the National conventions of the political parties obtained before the date of this Order are hereby declared to be void and invalid.

11. The two day mail notice required for the casting of lots pursuant to 25 P.S. § 2875 is hereby waived.

Opinion to follow.

**550**

Mr. Chief Justice Nix, Mr. Justice Larsen and Mr. Justice McDermott did not participate in the consideration or decision of this case.

APPENDIX B

*Revised Election Calendar for Representative in United States Congress and Delegate and Alternate Delegate to National Conventions*

March 10 First legal day to circulate and file nomination petitions

March 11 Secretary of the Commonwealth will send to the county boards of elections a written notice announcing that candidates are to be nominated at the April 28, 1992 primary for the office of Representative in Congress

March 11 Secretary of the Commonwealth will send to the county boards of elections a written notice announcing that candidates are to be elected at the April 28, 1992 primary for the party offices of Delegate and Alternate Delegate to the National conventions of the political parties and designating the number of such offices to be elected in each congressional district

March 17 The county boards of elections will publish a notice in newspapers that nominations of candidates for Representative in congress will be made and that elections of persons to the party offices of Delegate and Alternate Delegate to National conventions of the political parties will occur at the April 28, 1992 General Primary, such notice to specify that the Court has established a deadline of March 19, 1992 by which nomination petitions for such offices must be filed

March 19 Last day to circulate and file nomination petitions

March 20 First legal day to circulate nomination papers nominating independent candidates of political bodies or candidates of minor political parties

March 20 First legal day to file nomination papers nominating independent candidates of political bodies or candidates of minor political parties

March 20 Secretary of the Commonwealth will transmit to each county board of elections a list of all candidates for Representative in Congress and Delegate or Alternate Delegate to National conventions who have filed nomination petitions with the Secretary of the Commonwealth and who are not known to have withdrawn or been disqualified

March 23 The county boards of elections will deliver or mail to qualified electors who previously have been sent special write-in absentee ballots an additional list containing the names of all candidates for Representative in Congress or Delegate or Alternate Delegate to National conventions who have been named in nomination petitions filed with the Secretary

March 24 Last day for candidates who have filed nomination petitions to withdraw

March 25 Last day to file objections to nomination petitions

March 31 Last day that may be fixed by the Commonwealth Court for hearings on objections that have been filed to nomination petitions

April 3 Last day for Commonwealth Court to render decisions in cases involving objections to nomination petitions

May 8 Last day for acceptance of absentee ballots for all elections

[Pa.B.Doc. No. 92–528. Filed March 20, 1992, 9:00 a.m.]