Philip F. VALENTI; Sara Nichols; Betty Clift; Dorothy Ferebee,

Eric Bradway; Stuart W. Kessler; Arline Lotman; Patricia W. Lord; Howard William Glassman; Sean P. Lannon; Martin Zehr; Francis Worley; Kathleen H. Gaisford; Mark Steven Kruman; Philip Berg; and Leon Akselrad, Plaintiffs–Intervenors,

v.

Brenda K. MITCHELL, Secretary of the Commonwealth of Pennsylvania; William Boehm, Commissioner, Bureau of Commissions, Elections and Legislation,

Arlen Specter, United States Senator From Pennsylvania, Defendant–Intervenor,

Betty Clift, Dorothy Ferebee and Louis Fante, Proposed Intervenor, Appellants at No. 92–1262,

Brenda K. Mitchell and William Boehm, Appellants at No. 92–1264,

Philip Valenti, Betty Clift, Dorothy Ferebee, Eric Bradway, Stuart W. Kessler, Arline Lotman, Patricia W. Lord, Howard William Glassman, Sean Lannon, Martin Zehr, Francis Worley, Kathleen Gaisford, Philip Berg, Mark Kruman and Leon Akselrad, Appellants at No. 92–1274.

Nos. 92–1262, 92–1264 and 92–1274.

United States Court of Appeals, Third Circuit.

Argued April 9, 1992.

Decided April 14, 1992.

Mark A. Klugheit, (argued), Laura Aldir-Hernandez, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant-intervenor Arlen Specter in No. 92–1274.

Ernest D. Preate, Atty. Gen., Gwendolyn T. Mosely (argued), Sr. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Litigation Section, Office of Atty. Gen. of Pennsylvania, and Gregory M. Dunlap (argued), Office of General Counsel, Com. of Pennsylvania, Harrisburg, Pa., for appellants at No. 92–1264.

Samuel C. Stretton, (argued), West Chester, Pa., for appellants at Nos. 92–1262 and 92–1274.

Present: HUTCHINSON, SCIRICA and COWEN, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

These appeals have been consolidated and their disposition expedited because the issues raised affect the Pennsylvania primary election scheduled for April 28, 1992. At this year's primary, Pennsylvania voters will choose delegates to the major parties' nominating conventions for President, as well as party nominees for national and state office in the November general election. On April 6, 1992, Betty Clift, Dorothy Ferebee and Louis Fante appealed to this Court from an order of the United States District Court for the Eastern District of Pennsylvania entered on April 3, 1992 which denied their request for preliminary injunctive relief to appear on the ballot in the Pennsylvania primary as Congressional or Presidential delegate candidates (Appeal No. 92–1262). They petitioned for emergency hearing and argument.

Also on April 6, 1992, Brenda K. Mitchell, Secretary of the Commonwealth and William Boehm, Commissioner of the Bureau of Commissions, Elections and Legislation (the "Commonwealth officials") appealed from that portion of the district court's April 3, 1992 order which granted injunctive relief to Eric Bradway, a potential delegate candidate and Stuart Kessler, a potential Congressional candidate (Appeal No. 92–1264). In its April 3, 1992 order, the district court extended until April 6, 1992 the time for Bradway and Kessler to file their nominating petitions and enjoined the Commonwealth officials from rejecting Bradway and Kessler's petitions as untimely. Along with their appeal of the April 3, 1992 order, the Commonwealth officials filed an emergency motion for a stay of the district court's injunction pending appeal. Faced with these emergency matters, we directed the parties to file memoranda of law and appear for oral argument on Thursday April 9, 1992.

In the meantime, the rapid approach of April 28, the scheduled date for the primary election, led to further proceedings in the district court, the intervention of addi-

tional parties and the issuance of additional orders. While these orders largely eliminated the practical effect of the district court's April 3, 1992 order, they posed new issues that could have a significant effect on the timing and conduct of the Presidential election year's primary in Pennsylvania. The latest of these orders was issued April 9, 1992 just prior to the beginning of oral argument before this Court at 11:00 a.m. After argument, we therefore asked any parties who wished to appeal from the district court's April 9, 1992 order to file their appeals as soon as possible. From the bench, we also stayed all further proceedings in the district court pending our further order. Certain parties who had been denied relief filed appeals from the district court's April 9, 1992 order on April 10, 1992 (Appeal No. 92–1274). We consolidated them with the earlier appeals at Nos. 92–1262 and 92–1264, scheduled all the appeals for expedited disposition and directed the parties to file supplemental memoranda of law no later than noon on April 13, 1992.

Having considered the parties' arguments, we have decided to affirm the district court's April 9, 1992 order which denied injunctive relief to ten intervening plaintiffs, denied appellant Bradway's motion for a further extension of time to file, and also affirmed its earlier order of April 6, 1992 insofar as that order vacated the injunctive relief it had granted to appellant Kessler on April 3, 1992. We will also affirm that portion of the district court's April 3, 1992 order which denied appellants Clift, Ferebee and Fante's motion for injunctive relief. Based on these dispositions, the primary election can proceed as scheduled.[1] Our reasons follow.

## I.

Because of population changes shown by the decennial census, Pennsylvania Con-

gressional districts had to be redrawn for the 1992 primary election. On December 31, 1990, Congress issued a Certificate of Entitlement to the Pennsylvania Secretary of the Commonwealth stating that the Commonwealth was henceforth entitled to only twenty-one Congressional districts instead of the twenty-three districts the General Assembly had established in 1981 following the 1980 national census. See generally Pa.Stat. Ann. tit. 25, § 3571 (Supp. 1991) (setting forth the twenty-three districts). This time, the General Assembly could not agree on boundaries for the new districts and litigation erupted.

On January 28, 1992, the date on which circulation of nominating petitions was supposed to begin,[2] eight state senators filed a suit in equity in the Commonwealth Court of Pennsylvania against the Commonwealth officials and the Pennsylvania Department of State. They sought a declaration that the existing Congressional apportionment law providing for twenty-three districts was unconstitutional. They also requested the court to enjoin implementation of the official election schedule and to adopt a valid reapportionment plan if the General Assembly continued to fail to do so.

The Commonwealth Court granted the injunction on January 30, 1992 and required all parties to submit their proposed reapportionment plans no later than February 11, 1992. Additional parties, including the Attorney General, intervened and presented plans. The plaintiffs then applied to the Supreme Court of Pennsylvania to take plenary jurisdiction. With the statutory election schedule already delayed, the high court did so in order to expedite the matter and designated the President Judge of the Commonwealth Court as Master to conduct hearings and report to it with a recommended decision not later than

---

1. We note, however, that a constitutional challenge to the reapportionment scheme promulgated by the Supreme Court of Pennsylvania on March 10, 1992 is currently pending before a three-judge district court pursuant to 28 U.S.C.A. § 2284 (West 1978). Our decision does not affect that proceeding.

2. Under the Pennsylvania Election Code, "[n]o nomination petitions shall be circulated prior to the thirteenth Tuesday before the primary...." Pa.Stat. Ann. tit. 25, § 2868 (Supp.1991). The first date to circulate nominating petitions under the Code was January 28, 1992.

February 26, 1992. The state election officers then agreed to file a proposed election schedule with the Commonwealth Court by February 19, 1992.

On February 24, 1992, the Master filed his Findings, Recommended Decision and Form of Order. In recommending "Plaintiff's Plan 2" for adoption, the Master considered the equality of the redistricting plan under the one person, one vote principle, along with enhancement or dilution of racial minorities' political power, regional concerns and community interest. The new plan called for twenty-one Congressional districts.[3]

Because of the General Assembly's failure to adopt a reapportionment plan and the ensuing litigation, the Master also recommended revisions to the Pennsylvania election calendar made necessary by the delay in reapportionment up to that time. The suggested revisions were proposed in a Memorandum filed by the Commonwealth officials. The Master recommended that the Supreme Court also adopt the suggestion of the Commonwealth officials that the calendar for electing delegates and alternate delegates to the national conventions be revised along with the Congressional election calendar because delegates to the party conventions are selected in Pennsylvania from the Congressional districts. Exceptions to the Findings, Recommended Decision and Form of Order were filed with respect to the reapportionment issue, but not with respect to the revised election schedule.

In a per curiam Order dated March 10, 1992 the Supreme Court of Pennsylvania adopted the Master's Findings, Recommended Decision and Form of Order and dismissed all exceptions. *See Mellow v. Mitchell*, No. 7 M.D. Misc. Dkt.1992, —— Pa. ——, 607 A.2d 204 (1992). In so doing, it declared the provision of the Election Code providing for twenty-three Congressional districts unconstitutional, promulgated a new reapportionment plan providing for twenty-one districts and revised the election schedule.

Of prime relevance to this appeal is the Pennsylvania Supreme Court's adoption, as recommended, of a new election schedule. It ordered the Secretary of the Commonwealth and all election officers to conduct the election in accordance with this new schedule. In the schedule set out in Appendix B to its Order and entitled "Revised Election Calendar," the Court set March 10, 1992 as the first day to circulate nominating petitions and March 19, 1992 as the last date to file nominating petitions.[4] Any signatures obtained prior to March 10, 1992 were declared invalid.

In its order, the Court also attempted to provide for public notice of its March 10, 1992 Order. It ordered the county boards of elections to publish notice of its order and revised schedule in the newspapers on March 17, 1992. It also ordered Secretary Mitchell to publish it in the Pennsylvania Bulletin as soon as possible. On March 26, 1992 the Court filed a written opinion explaining its March 10, 1992 Order. *See Mellow v. Mitchell*, 607 A.2d 204 (Pa.1992). The opinion does not discuss the Revised Election Schedule at issue in this appeal.

When the Supreme Court of Pennsylvania filed its Order establishing the districts at 4:30 p.m. on March 10, 1992, candidates and delegates had until March 19, 1992 to obtain the number of signatures required for filing a nominating petition, a period of between eight and nine days. Before the Court's adoption of the Revised Election Schedule, the time for circulating and filing nominating petitions had been governed by section 2868 of the Pennsylvania Election Code. It provided in pertinent part:

---

**3.** As noted above, the constitutional validity of this plan is not before us and remains pending before a three-judge district court.

**4.** To become a Congressional candidate or Presidential delegate, a person's nominating petition must contain the statutorily defined number of signatures. The number of signatures required

for a Congressional candidate is 1,000; the number required for a delegate is 250. These signatures must be from registered voters in the party and in the Congressional district for which the candidate is seeking to be a nominee or a delegate. *See* Pa.Stat. Ann. tit. 25, § 2872.-1(12) & (29) (Supp.1991).

No nomination petitions shall be circulated prior to the thirteenth Tuesday before the primary. [January 28, 1992] ... nor later than the tenth Tuesday prior to the primary.

Pa.Stat. Ann. tit. 25, § 2868 (Supp.1991). Under this scheme, a potential candidate had no more than twenty-one days to obtain the required number of signatures.

Attempts were made to notify potential candidates of the March 19, 1992 filing deadline. An employee of the Commonwealth Bureau of Commissions, Elections, and Legislation (the "Bureau") testified that she called the state Republican and Democratic Committees on the evening of March 10, 1992 and told them the contents of the Order. She also placed calls to the campaign offices of the Presidential candidates, but was not able to reach all of them. On March 11, 1992, the Bureau mailed written notice of the Order to the Presidential candidates and to Congressional candidates who had picked up petitions at the Bureau. The Bureau could not contact the delegate candidates because they had to pick up the petitions directly from the Presidential candidates themselves.[5]

Official notice of the March 19 deadline was published in the newspapers by the local boards of elections on March 17 as the Supreme Court's order provided. The

Commonwealth officials also produced evidence of news articles in the Philadelphia Inquirer and other local newspapers dated March 11, 1992, March 12, 1992 and March 13, 1992 that generally described the changes in Congressional districts and set forth the March 19, 1992 deadline for filing petitions. Notice of the supreme court's order was not published in the Pennsylvania Bulletin, however, until March 21, two days after the deadline passed.[6]

The case presently on appeal arose out of the failure of potential candidates and delegates to obtain the required number of signatures by the March 19, 1992 deadline.

## II.

On March 23, 1992, Philip Valenti, Sara Nichols, Betty Clift and Dorothy Ferebee filed a complaint under 42 U.S.C.A. § 1983 (West 1981) in the district court seeking a declaration that the actions of the Commonwealth officials in refusing to list Ferebee on the Democratic party's primary ballot as a candidate for Presidential delegate, in not listing Clift and Nichols as Congressional candidates on that party's primary ballot,[7] and in not allowing any Democratic Presidential delegates for Lyndon H. LaRouche to appear on the ballot[8] violated their con-

5. The Pennsylvania Delegate Selection Plan for the 1992 Democratic National Convention provides that the presidential candidate's authorized representative has the right to approve any delegate pledged to that presidential candidate and that the authorized representative will distribute nomination petitions to approved delegate candidates.

6. The Order was deposited with the Legislative Reference Bureau on March 11, 1992. The printing schedule for documents deposited with the Legislative Reference Bureau for publication in the Pennsylvania Bulletin is rooted in statute and regulation. Under this schedule, March 21, 1992 was the earliest print date possible. See Memorandum from Gary R. Hoffman, Director Pennsylvania Code & Bulletin, to Gregory Dunlap (April 2, 1992).

7. Clift, Ferebee and Nichols each alleged that despite using their best efforts they were not able to obtain the required number of signatures in the brief time period set forth in the Supreme Court's Revised Election Schedule.

Each of their nominating petitions filed on March 19, 1992 were rejected due to this deficiency. Nichols later withdrew as a plaintiff and is not a party to this appeal.

8. Valenti is the authorized representative for the Democratic Presidential candidate Lyndon H. LaRouche, Jr. Pursuant to Pa.Stat. Ann., tit. 25, § 2867 (Supp.1991), nominating petitions for delegates pledged to a particular candidate must be signed by the candidate. LaRouche is presently incarcerated at the Federal Medical Center in Rochester, Minnesota. Valenti alleged that the short time period in the Revised Election Schedule prevented him from obtaining LaRouche's signature. As a consequence, Valenti said no Presidential delegate for LaRouche would appear on the primary ballot unless Valenti were granted a preliminary injunction. The Commonwealth "acquiesced in [t]his aspect of the prayer for a preliminary injunction," thus allowing a LaRouche delegate list to appear on the Democratic primary ballot. See April 3, 1992 Opinion and Order at 30. This acquiescence was reaffirmed in the district court's

stitutional rights of free association under the First Amendment and equal protection under the Fourteenth Amendment. They also sought preliminary and permanent injunctive relief enjoining the Commonwealth officials from refusing to accept their nominating petitions and to allow them to appear on the ballot in the primary. The court held a hearing on March 30, 1992 and added Eric Bradway as an additional plaintiff at that time. Bradway alleged he was unable to obtain the 250 signatures required to become a candidate for presidential delegate in the truncated time period.

On April 1, 1992 the district court held that the shortened time period for filing nominating petitions combined with the notification procedures adopted by the Pennsylvania Supreme Court placed an unreasonable and unfair burden on candidates attempting to get on the ballot in violation of the First Amendment. It did not, however, find an equal protection violation. It also granted a preliminary injunction extending the deadline for the filing of nominating petitions by Clift, Ferebee and Bradway until April 6, 1992. It enjoined the Commonwealth officials from refusing to accept the petitions as untimely and from refusing to accept the delegate list signed by LaRouche. On April 2, 1992, the Commonwealth officials appealed that order to this Court at No. 92–1259 and sought a stay of the injunction in the district court pending appeal. Alternately, they asked the district court to reconsider its ruling. The district court did not grant a stay but agreed to reconsider its order. At the hearing held on April 2, 1992, plaintiffs' counsel moved to allow the intervention of Stuart W. Kessler and Louis J. Fante as additional plaintiffs. The motion was granted with respect to Kessler only. The district court held that Fante's claim was barred under the *Rooker–Feldman* doc-trine because he had sought relief in the Supreme Court of Pennsylvania and that relief was finally denied.

On April 3, 1992, after reconsideration, the district court vacated its April 1, 1992 order granting injunctive relief except with respect to that portion pertaining to Valenti and the LaRouche delegate list.[9] It then granted a preliminary injunction in favor of Bradway and Kessler only. It enjoined the Commonwealth officials from refusing as untimely any nominating petition submitted by Bradway or Kessler if submitted before April 6, 1992.

After appellants Clift, Ferebee and Fante on April 6, 1992 appealed the district court's April 3, 1992 Order 790 F.Supp. 534 denying their motion for a preliminary injunction (No. 92–1262),[10] and after the Commonwealth officials on the same date had appealed from that portion of the district court's order granting injunctive relief in favor of Bradway and Kessler (No. 92–1264) and moved this Court for a stay pending their appeal, the district court entered further orders on April 6, 1992 and April 9, 1992. In its April 6, 1992 order the district court vacated, on jurisdictional grounds, that portion of its April 3, 1992 order granting relief to Kessler. It held Kessler's claim was barred under the *Rooker–Feldman* doctrine because he too had already been denied relief by the Supreme Court of Pennsylvania.

On April 7, 1992 and April 9, 1992, the district court allowed the following parties to intervene: Senator Arlen Specter as defendant; Arline Lotman, Patricia W. Lord, Howard W. Glassman, Sean Lannon, Martin Zehr, Francis Worley, Kathleen Gaisford, Philip Berg, Mark Kruman, and Leon Akselrad as plaintiffs. In its April 9, 1992 Memorandum and Order, the district court denied the motions for injunctive relief of the ten intervening plaintiffs. In the same

April 3, 1992 Order. Accordingly, Valenti is not a party to this appeal.

9. For this reason, the Commonwealth officials' appeal from this order at No. 92–1259 is without practical effect. We need only consider its appeal at No. 92–1264 from the April 3, 1992 Order of the district court.

10. Although Fante has joined Clift and Ferebee's appeal from the district court's denial of a preliminary injunction as to them, the district court denied his motion to intervene on jurisdictional grounds under the *Rooker–Feldman* doctrine. For this reason, the district court did not consider whether or not Fante was entitled to injunctive relief.

order the district court granted Kessler's motion for reconsideration of its April 6, 1992 order vacating any relief as to him on *Rooker–Feldman* grounds and, upon reconsideration, affirmed that order. Finally, Bradway requested an extension of time from the district court's April 3, 1992 order allowing him until April 6, 1992 to file a petition containing 250 valid signatures. Bradway failed to file said petition in the extended time period and his request for an extension was denied in the district court's April 9, 1992 order. At No. 92–1274, the intervenors, Bradway and Kessler have appealed from the April 9, 1992 order. That appeal has been consolidated with the appeals at No. 92–1262 and No. 92–1264.

### III.

### A.

This Court has appellate jurisdiction over the Commonwealth officials' interlocutory appeal at No. 92–1264 from the district's court's April 3, 1992 order granting injunctive relief to Bradway and Kessler pursuant to 28 U.S.C.A. § 1292(a)(1) (West Supp. 1992).[11] That appeal has, however, been deprived of any practical effect because of the district court's April 6, 1992 order vacating its grant of injunctive relief to Kessler under the *Rooker–Feldman* doctrine and by Bradway's failure to file a petition containing 250 valid signatures in the extended time period the district court granted him. On April 9, 1992, the district court affirmed its April 6, 1992 order when asked by Kessler to reconsider and it denied Bradway's request for a further extension of time. The issues raised in the appeal at No. 92–1264 will be adequately dealt with in connection with our disposition of the remaining expedited appeals under consideration. Accordingly, we will dismiss the Commonwealth officials' appeal at No. 92–1264 as moot.

█ Appellate jurisdiction over the appeal of Clift, Ferebee and Fante at No. 92–

1262 from the district court's April 3, 1992 order denying them injunctive relief, and over the appeal of the intervening plaintiffs and Bradway at No. 92–1274 from the district· court's April 9, 1992 order denying them relief, is also provided by 28 U.S.C.A. § 1292(a)(1). The district court dismissed Kessler's and Fante's claims for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine. When a claim seeking injunctive relief is dismissed on jurisdictional grounds, it has the effect of denying the ultimate equitable relief sought by the claimant, and the order is appealable under section 1292(a)(1). *See Cohen v. Board of Trustees of Univ. of Medicine and Dentistry,* 867 F.2d 1455, 1464 (3d Cir.1989) (in banc).

### B.

Our conclusion that we have appellate jurisdiction over the appeals at Nos. 92–1262 and 92–1274 does not end our jurisdictional inquiry. We must also assure ourselves of the district court's subject matter jurisdiction over the claims these parties have asserted. *See Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) ("every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review'"). In the usual course, the district court's subject matter jurisdiction over appellants' 42 U.S.C.A. § 1983 claims that the Commonwealth officials deprived them of rights secured by the Constitution would be plain under 28 U.S.C.A. § 1331 (West Supp.1991) (federal question) and 28 U.S.C.A. § 1343(a)(3) (West Supp.1991) (civil rights).

Here, however, the question is complicated because the district court's declaration of unconstitutionality and any grant of injunctive relief requiring the Commonwealth officials to extend the deadline for filing

---

**11.** That section provides courts of appeals with jurisdiction over:

[i]nterlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court[.]

28 U.S.C.A. § 1292(a)(1).

nominating petitions conflicts with the Revised Election Schedule the Supreme Court of Pennsylvania finally promulgated in its Order of March 10, 1992. Additionally, on April 2, 1992, before the district court entered its order on April 3, 1992, the Supreme Court of Pennsylvania denied petitions by appellants Kessler and Fante for relief from the March 19, 1992 deadline. This interplay between the state and federal courts requires us to consider whether the *Rooker–Feldman* doctrine deprives the district court of the subject matter jurisdiction it would normally have, both generally and with respect to any particular plaintiffs.

The *Rooker–Feldman* doctrine is usually said to be derived from 28 U.S.C.A. § 1257 (West 1991) which states that "[f]inal judgments or decrees rendered by the highest court of a state in which a decision could be had, may be reviewed by the Supreme Court...." In *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 1314, 75 L.Ed.2d 206 (1983) the Supreme Court of the United States interpreted that statute as providing the exclusive means for review of final adjudications of a state's highest court. Federal district courts lack subject matter jurisdiction to review such final adjudications or to evaluate constitutional claims that are "inextricably intertwined with the state court's [decision] in a judicial proceeding." *Feldman*, 460 U.S. at 483 n. 16, 103 S.Ct. at 1315 n. 16.

### 1. *Fante and Kessler*

■ The Supreme Court has defined an adjudication as involving the application of existing law to the facts of a particular case. *Id.* at 479, 103 S.Ct. at 1313. Appellants Fante and Kessler each filed petitions in the Supreme Court of Pennsylvania seeking relief from the March 19, 1992 filing deadline. That Court denied both petitions in orders dated April 2, 1992. The Court's denial of their petitions was an "adjudication" of their claim, thus placing any subsequent challenge outside the sub-

ject matter jurisdiction of the district court, and in turn, this Court.

■ In their petitions, Fante and Kessler raised only an equal protection argument. We reject their argument that since they never raised, and the Supreme Court of Pennsylvania never considered, their First Amendment challenges, *Rooker–Feldman* cannot bar them from pursuing these claims in federal court. They each had an opportunity to raise a first amendment challenge and failed to do so. *Cf. Centifanti v. Nix*, 865 F.2d 1422, 1433 (3d Cir. 1989) (failure to raise constitutional claims in state supreme court does not bar district court from hearing those claims when plaintiff did not have "realistic opportunity to fully and fairly litigate" claims in state court). They cannot be allowed to escape *Rooker–Feldman* by raising a new constitutional theory in federal court. *See Feldman*, 460 U.S. at 482, 103 S.Ct. at 1314 ("By failing to raise his claims in state court a plaintiff may forfeit his right to obtain review of the state-court decision in any federal court."). Under principles of claim preclusion, they had a full and fair opportunity to litigate their first amendment claim in the state court, and here they merely seek a second bite at the apple. *See generally* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* §§ 4406–07 (West 1981). Accordingly, we will affirm the district court's denial of Fante's motion to intervene and its order upon reconsideration vacating any injunctive relief granted to Kessler.

### 2. *Clift, Ferebee, Bradway and the Intervenors*

■ The Commonwealth officials contend the district court lacked subject matter jurisdiction over these appellants because any action by the district court directing them to extend the filing deadline is in direct conflict with the Revised Election Schedule, an adjudication of the Supreme Court of Pennsylvania. We reject that broad argument. The *Rooker–Feldman* doctrine does not completely take away the power of a federal district court to act on

constitutional claims in a manner contrary to prior rulings of the highest state court. If the decision of the high state court is not an "adjudication," a federal district court is not barred from review. The Supreme Court in *Feldman* drew a distinction between adjudicative and non-adjudicative acts. Non-adjudicative or administrative acts of the high state court can be reviewed. Such acts generally require "look[ing] to the future and chang[ing] existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its powers", instead of the application of existing laws to particular facts. *Feldman*, 460 U.S. at 477, 103 S.Ct. at 1312.

We recently discussed this distinction in *Blake v. Papadakos*, 953 F.2d 68 (3d Cir. 1992). There we held that an order of Pennsylvania's highest court removing President Judge Blake of the Philadelphia Court of Common Pleas from an administrative position was protected from district court review. Judge Blake petitioned the high court to set aside its order as violative of the state and federal constitutions and the petition was denied. We held that the Supreme Court of Pennsylvania's order denying the petition was an adjudicative act "because the Court, in reaching its decision to reject Judge Blake's federal and state claims, applied existing law to Judge Blake's particular case." *Id.* at 73.

■ In applying the *Rooker–Feldman* doctrine, we also look at the nature of relief sought in federal court. *See Centifanti v. Nix*, 865 F.2d 1422 (3d Cir.1989); *Stern v. Nix*, 840 F.2d 208 (3d Cir.), *cert. denied* 488 U.S. 826, 109 S.Ct. 77, 102 L.Ed.2d 53 (1988). In *Stern*, an attorney disbarred by the Supreme Court of Pennsylvania sought injunctive relief staying the order of the high court that disbarred him. We held this claim seeking reversal of the high court's judgment was barred by *Rooker–Feldman*. *Stern*, 840 F.2d at 212. In *Centifanti*, in contrast, we held that a suspended attorney's request for a declaration that the procedural rules for attorney reinstatement to the bar violated due process and his request for prospective in-junctive relief precluding future use of the rules was not barred by *Rooker–Feldman*. *Centifanti*, 865 F.2d at 1430. Centifanti's request for prospective relief, unlike Sterns' would not require review of the Supreme Court's decision denying his petition for reinstatement.

■ We need not here decide whether the Revised Election Schedule the Pennsylvania Supreme Court promulgated in connection with its decision on the reapportionment of Congressional districts is adjudicative or non-adjudicative or whether the injunctive relief sought by appellants is merely prospective. As pointed out by several courts and commentators, the *Rooker–Feldman* doctrine has a close affinity to the principles embodied in the legal concepts of claim and issue preclusion. *See* Wright, Miller & Cooper, *supra*, § 4469 at 668 ("Although no substantial harm seems to have been done by the jurisdictional cases, it would be better to go straight to the res judicata rules that justify preclusion."). The basic premise of preclusion is that non-parties to a prior action are not bound. A non-party is not precluded from relitigating matters decided in a prior action simply because it passed by an opportunity to intervene. *See Chase National Bank v. City of Norwalk*, 291 U.S. 431, 54 S.Ct. 475, 78 L.Ed. 894 (1934); *Cf. Society Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1050 n. 4, 1053 n. 7 (3d Cir.1980). Appellants Clift, Ferebee, Bradway and the intervening plaintiffs were not parties to the Supreme Court's March 10, 1992 Order and thus had no opportunity to challenge the constitutionality of the March 19, 1992 filing deadline there.

We have found no authority which would extend the *Rooker–Feldman* doctrine to persons not parties to the proceedings before the state supreme court and are referred to none. The suggested analogy to principles of claim and issue preclusion is consistent with prior decisions of this Court concerning *Rooker–Feldman*. In *Blake*, *Stern* and *Centifanti*, our determination that the *Rooker–Feldman* doctrine served as a bar was based on a determination that the Supreme Court of Pennsylvania had

applied existing law to the facts of the federal court plaintiff's case. More significantly, in *Blake* we said:

> Had Judge Blake not instituted his action ... in the Pennsylvania Supreme Court but instead had he filed his action directly in the United States District Court, the *Rooker–Feldman* doctrine could not have precluded federal jurisdiction.... But by challenging the Pennsylvania Supreme Court's action before that very court, Judge Blake elected his remedy.

*Blake*, 953 F.2d at 73. Here we are not "review[ing]" a final state-court judgment in a particular case." *Centifanti,* 865 F.2d at 1429. There is no final state court judgment as to Clift, Ferebee, Bradway or the intervening plaintiffs. Thus, we reject the Commonwealth officials' argument that the *Rooker–Feldman* doctrine should have barred the district court from hearing these appellants' claims for injunctive relief.

We realize the confusion and uncertainty this result creates for states, such as Pennsylvania, that have scheduled early primary elections on the heels of reapportionment in Presidential election years. The intensely partisan political issues of reapportionment can all too often, as here, prevent the state's legislature from enacting reapportionment legislation in time to meet the statutory election schedule. The state courts are unable to act until the state "legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973).

Since *Rooker–Feldman* does not bar individual constitutional claims by persons not parties to earlier state court litigation seeking a place on the ballot, it cannot stem the challenges to the Pennsylvania Supreme Court's March 10, 1992 Revised Election Schedule now before this Court. These challenges have resulted in inconsistent decisions by the Supreme Court of

Pennsylvania and the district court in this case.[12] That inconsistency adds to the confusion of the candidates and the electorate over the timing and conduct of the affected primary election.

Federal law also permits a three-judge district court to hear constitutional challenges to reapportionment plans, *see* 28 U.S.C.A. § 2284, but their last minute consideration by it is even more likely because of federal reluctance to interfere with the state's authority over congressional reapportionment. *See White* 412 U.S. at 795, 93 S.Ct. at 2354 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 160, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971)). We think these problems make it incumbent upon the district court in this case to bear in mind the impact of its entry into the electoral process. When considering challenges concerning only election procedures, as in this case, district courts should be mindful of the residual sovereignty of the states over "the Times, Places and Manner of holding Elections for Senators and Representatives" expressly recognized in Article 1, Section 4 of the United States Constitution. For these reasons, the Supreme Court requires federal courts embroiled in constitutional challenges to election rules to nicely balance all the competing interests. *See Anderson v. Celebrezze*, 460 U.S. 780, 789–90, 103 S.Ct. 1564, 1570–71, 75 L.Ed.2d 547 (1983). We therefore turn to this balancing in our consideration of the appeals of Clift and Ferebee.

## IV.

The district court denied Clift's and Ferebee's requests for preliminary injunctive relief. Although it held they could demonstrate a likelihood of success on the merits of their first amendment claims, it found that they were unaffected by any delay in receiving official notice of the March 10, 1992 Order because Clift had actual notice of the Order on March 10 and Ferebee on March 11. We review the dis-

---

12. While the Supreme Court denied the petitions for filing extensions by appellants Fante, Kessler and others, the district court in this case granted time extensions. Further, after hearing

oral argument, we have learned of other plaintiffs seeking ballot access. *See, e.g., Gaughen v. Mitchell,* No. 92–451 (April 10, 1992 M.D.Pa.).

trict court's denial of injunctive relief for an abuse of discretion. *See Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 472 (3d Cir.1990). An abuse of discretion involves "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *International Union, UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir.1987).

The district court found that although Clift knew about the Order on March 10, she did not actually attempt to gather any signatures until March 17, 1992, and although Ferebee knew about the Order on March 11, she made no attempt to collect signatures until March 16, 1992. *Id.* at 28. We cannot say these findings are clearly erroneous, and we see no other abuse of discretion in the district court's decision to deny relief on the maxim "[e]quity aids the vigilant, not those who rest on their rights." *Id.* at 29.

Even if Clift and Ferebee did not have sufficient actual notice of the Supreme Court of Pennsylvania's March 10, 1992 order to obtain the required number of signatures by the filing deadline, we must consider whether the district court abused its discretion in holding that Clift and Ferebee, or for that matter any of the plaintiffs in this case, could demonstrate a likelihood of success on the merits of their first amendment claims.[13] The district court so found based on its application of the *Anderson* balancing test. The Supreme Court of the United States set forth that test as follows:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmuspaper test" that will separate valid from invalid restrictions. Instead a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First ... Amendment[ ] that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570 (citation omitted).

"Our review of the district court's application and interpretation of legal principles predicate to its grant or denial of injunctive relief is plenary." *Carey v. Pennsylvania Enters., Inc.*, 876 F.2d 333, 337 (3d Cir.1989). Under that standard, we think that the district court undervalued the magnitude of the state's interest in this case. Certainly, the injury to a potential candidate resulting from denial of a place on the primary ballot is great. The district court in its opinions prior to April 9, 1992, however, paid too little attention to the very real difficulties facing the state election officials and the very real adverse impact delay in the election would have on the organized parties, the voters and other candidates who had kept a more watchful eye on the reapportionment process.

In evaluating the alleged burden of the Revised Election Schedule on the appellants' first amendment rights, like the district court, we consider whether the March 10, 1992 Revised Election Schedule and the way it was published and implemented burdened the appellants' constitutional rights to associate with the parties or candidates of their choice. We do not read the district court's opinion as holding the eight to nine day time between the Supreme Court's order and the filing deadline to be a problem in and of itself. Considering the number of signatures involved—1,000 for a congressional candidate, 250 for a delegate—we agree. Courts have routinely upheld signa-

---

**13.** The district court considers the following factors in evaluating an application for a preliminary injunction: (1) likelihood of success on the merits; (2) irreparable injury; (3) injury to other interested persons; and (4) the public interest. *See Constructors Ass'n of Western Pa. v. Kreps*, 573 F.2d 811 (3d Cir.1978).

ture requirements seemingly more burdensome.

In *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), a California statute required an independent candidate for President to file a petition signed by 5% of the total number of votes cast in California in the last general election. This required the candidate to gather 325,000 signatures over 24 days. The Court held this requirement was not per se unconstitutional. *Id.* 94 S.Ct. at 1278; *see Perry v. Grant*, 775 F.Supp. 821 (M.D.Pa.1991) (41,-305 signatures within 149 days held constitutional); *Williams v. Tucker*, 382 F.Supp. 381 (M.D.Pa.1974) (2,452 signatures within 21 days held constitutional).

Unable to hold the eight to nine day time period unconstitutional, the district court focused on whether the appellants had the "knowing right" to get their names on the ballot. April 3, 1992 Opinion and Order 790 F.Supp. 534, 548 (E.D.Pa.1992). It focused on the fact that the Supreme Court of Pennsylvania's March 10, 1992 Order was not officially published in newspapers by the local bureaus of elections until March 17th, two days prior to the filing deadline, and was not published in the Pennsylvania Bulletin until March 21, two days after the deadline. The Commonwealth officials did, however, produce evidence of notice of the Order in widely circulated newspapers as early as March 11, 1992.

While the Supreme Court of Pennsylvania's Order did not provide for immediate notification, immediate notification was provided where feasible. On the evening of March 10, 1992, an employee of the Bureau called the state Republican and Democratic Committees. The Bureau mailed notice of the Order to all congressional candidates who had picked up nominating petitions on March 11, 1992. The Bureau also called the Presidential candidates' offices it could reach on March 10, 1992 to notify them of the Order. It also mailed notice of the Order to them on March 11, 1992. The Bureau was unable to notify the delegate candidates directly because those seeking to become delegates picked up their petition forms from the offices of the Presidential candidates. Thus, the responsibility for providing filing information to delegates rested with the campaign offices of the presidential candidates, not the Bureau. For example, appellant Bradway testified he was aware of the redistricting litigation and relied on someone in Jerry Brown's office to keep him informed but that he did not receive notice until March 17, 1992.

Under the Election Code as it existed prior to the Supreme Court's March 10, 1992 Order, the first day to circulate petitions was January 28, 1992 and the filing deadline was 21 days later. Thus candidates and delegates knew well in advance that they would need signatures. As serious contenders in the political arena, they knew, or certainly should have known, that a reapportionment plan was being formulated and could issue any day. A serious candidate, even one outside the political mainstream, should have been on notice of the redistricting and poised to get their nominating petitions filed. While the Bureau might have done a better job of providing notice, we do not think its efforts were constitutionally inadequate. Thus, while timely official notice may not have been available to all persons who wanted to be a candidate for Congress or delegate to a convention, we cannot ignore the notice that appeared in newspapers of general, regional circulation on March 11, 12 and 13, 1992. We think that the persons who had failed to act until official publication are, at least to some extent, themselves responsible for the difficulty they had in collecting the 250 or 1,000 signatures necessary to meet the March 19, 1992 filing deadline.

Weighed against that difficulty is the interest of the state, its citizens and other candidates. We note immediately that this is not a case in which a statute or rule infringes on the rights of independent candidates. *See, e.g., Anderson*, 460 U.S. at 805–06, 103 S.Ct. at 1578–79 (early filing deadline for independent presidential candidates violates First and Fourteenth Amendments); *Williams v. Rhodes*, 393 U.S. 23, 31–32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968) (burdensome petition filing requirement for

new political parties to be placed on state ballots violated equal protection clause). The Court in *Anderson* noted that "because the interests of minor parties and independent candidates are not well represented in ... legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decisionmaking may warrant more careful judicial scrutiny." *Anderson*, 460 U.S. at 1572 n. 16, 103 S.Ct. at 1572 n. 16. All of the challenges in this case were brought by congressional or delegate candidates from the two major parties. We thus question the district court's concern in this case with protecting independent candidates as evidenced by its statement that the state's asserted interest in "protecting the integrity of the party system means more than protecting the virtual monopoly of the two traditional parties." 790 F.Supp. 534, 543.

 The state's interest in a timely and orderly election is strong. The Supreme Court has recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process[]." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). Furthermore, as recognized by the Court in *Anderson*, "although candidate eligibility requirements may exclude particular candidates, it remains possible that an eligible candidate will 'adequately reflect the perspective of those who might have voted for a candidate who has been excluded'." *Anderson*, 460 U.S. at 793 n. 15, 103 S.Ct. at 1572 n. 15 (quoting L. Tribe, *American Constitutional Law* 774–75 (1978)).

At the time of the district court's April 3, 1992 Order, much of the ballot and voting machine preparation had already taken place. The district court acknowledged the possible disenfranchisement of absentee and military voters caused by eleventh-hour changes to the ballot but did not give it great weight. The deadlines for the filing of objections to nominating petitions, and for Commonwealth Court hearings on those petitions had also passed. The dis-

trict court responded by stating "the election may indeed have to be postponed until sometime in May." 790 F.Supp. 534, 547.

Several courts have, however, recognized that the imminence of an election may justify imposing an interim schedule. *See, e.g., Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). The rationale is that more harm than good would be occasioned by the delay of an election. *See Smith v. Board of Election Comm'rs*, 586 F.Supp. 309, 312 (N.D.Ill. 1984) (denying name placement on ballot on eve of election because disruption of primary would "disserve the public interest"). We are inclined to agree that if the district court's order would in fact have required postponement of the primary election, it would have failed the *Anderson* balancing test.

The strong state interest in holding its primary as scheduled obviously made it necessary to place some burden on appellants' alleged first amendment rights to have more than the two or three days they claim were all they had to secure the 1,000 signatures needed to get on the primary ballot for Congress or the 250 needed for delegates.

Most significantly, we think the district court gave inadequate attention to the strong public interest in an orderly primary less than three weeks away. We think it also failed adequately to consider the impact of postponing the primary on the media efforts and campaign strategies of other candidates. *See Republican Party v. Wilder*, 774 F.Supp. 400, 407 (W.D.Va. 1991) (considering the interests of candidates).

 Even if the district court did not abuse its discretion in concluding that the plaintiffs were likely to succeed on their First Amendment claims, and thus did not err in granting injunctive relief to Bradway in its April 3, 1992 Opinion and Order, its April 9, 1992 Opinion and Order refusing any further relief fully disposed of his claim for effective equitable relief, as well as those of the ten intervening plaintiffs. That order is the subject of the appeal at No. 92–1274. We are persuaded that the April 9, 1992 order denying further relief

302

should be affirmed. We think it is beyond question that the district court appropriately decided on April 9 that the equities were no longer in favor of granting injunctive relief to the intervening plaintiffs or granting a further extension of time to Bradway. Its April 9 denial of relief was a correct balancing of the parties' rights under *Anderson* as well as an appropriate exercise of the discretion generally residing in a judge who sits as a chancellor in equity.

## V.

For the foregoing reasons we will affirm that aspect of the district court's April 3, 1992 order denying injunctive relief to appellants Ferebee and Clift. We will also affirm the district court's April 9, 1992 order denying injunctive relief to the ten intervening plaintiffs and additional injunctive relief to Bradway. Finally, we will affirm the district court's order denying Fante's motion to intervene and its order affirming upon reconsideration its earlier order vacating the injunctive relief it granted to appellant Kessler for lack of subject matter jurisdiction. The parties shall each bear their own costs.