

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-28-2004

# Walker v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 03-1896

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Walker v. Horn" (2004). *2004 Decisions.* Paper 266.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/266

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

(Opinion filed September 28, 2004)

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-1896

MICHAEL TYRONE WALKER,
Appellant

v.

MARTIN HORN, Commissioner of
Pennsylvania Department of
Corrections;  JEFFREY BEARD, Deputy
of Treatment of Corrections;
KENNETH KYLER, Superintendent at
SCI-Camphill Prison; MARK LASKEY,
Medical Director of SCI-Camphill Prison;
WILLIAM W. YOUNG, Medical Doctor
of SCI-Camphill Prison; WILLIAM
WARD, Unit Manager
of SCI-Camphill Prison; ARTHUR
AUXER, Unit Manager of
SCI-Camphill Prison

Appeal from the United States
District Court for the Middle
District of Pennsylvania
(Civ. No. 96-cv-00518)
District Judge: Hon. Edwin M. Kosik

Submitted pursuant to
Third Circuit LAR 34.1(a)
June 25, 2004

Before: NYGAARD, McKEE and
CHERTOFF, *Circuit Judges*

Thomas M. Place, Esq.
150 South College Street
Carlisle, PA 17013

*Attorney for Appellant*

Leslie A. Miller, Esq.
    *General Counsel*
    *Commonwealth of Pennsylvania*
Michael A. Farnan, Esq.
Pennsylvania Department of Corrections
Office of Chief Counsel
55 Utley Drive
P.O. Box 598
Camp Hill, PA 17011

*Attorney for Appellees, Martin*
*Horn, Commissioner of Pennsylvania*
*Department of Corrections, Jeffrey*
*Beard, Deputy of Treatment of*
*Corrections, Kenneth Kyler,*
*Superintendent at SCI-Camphill Prison,*
*William Ward, Unit Manager of*
*SCI-Camphill Prison and Arthur Auxer,*
*Unit Manager of SCI-Camphill*

Randall G. Gale, Esq.
Thomas, Thomas & Hafer
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108

*Attorney for Mark Laskey, Medical*
*Director of SCI - Camphill Prison,*
*Appellee*

1

OPINION

McKEE, *Circuit Judge*.

In this § 1983 action, Michael Tyrone Walker, a state prisoner, alleges that his rights under the First, Eighth and Fourteenth Amendments were violated when prison officials sought a state court order authorizing them to force-feed him after he went nine days without eating. The district court granted summary judgment to all of the defendants except Arthur Auxer, a prison official; and Dr. Mark Lasky, the medical director of the prison. Shortly before their trial began, Walker withdrew his claims against Auxer, leaving Lasky as the sole remaining defendant. The jury ultimately returned a verdict in favor of Lasky, and Walker appealed. For the reasons that follow, we will affirm.

## I. BACKGROUND[1]

In August 1995, Walker was incarcerated in the Special Management Unit ("SMU") at the State Correctional Institution at Camp Hill, Pennsylvania ("SCI-Camp Hill"). The SMU was reserved for the most difficult prisoners in the state system and Walker's placement there meant that he was confined in his cell twenty-three hours a day.

Walker is a member of the Nation of Islam, a self-proclaimed Islamic sect that follows the teachings of Elijah Muhammad. Members of the Nation of Islam fast during Ramadan and at other times during the year in accordance with the teachings of Elijah Muhammad. Walker claims that since his incarceration in 1988 he has engaged in periodic religious fasts in which he abstains from solid foods but drinks liquids. [2]

Walker's Prison Adjustment Record reflects that on August 20, 1995, he became angry, allegedly because he was not receiving legal material.[3] He made threats, became argumentative, and was placed on further restriction even though he was already in the SMU. A few days later, while still confined in the SMU, Walker claims to have begun a religious fast which he planned to continue for three to fifteen days. Like his earlier fasts, he purportedly abstained from solid food, but drank liquids.

Beginning on August 26, 1995, Walker was seen at least daily by prison medical staff. William Young, M.D., a physician on the medical staff at SCI-Camp Hill under Dr. Lasky's supervision, examined Walker on that date. Walker claims that Dr. Young checked his weight and blood pressure, listened to his

---

[1]Unless otherwise specified, references to testimony refer to testimony that was presented in the district court.

[2]The fasts last from three to thirty days.

[3]Walker had numerous civil and criminal cases pending at the time.

2

breathing, and examined his eyes.[4] Walker also claims that Dr. Young noted that Walker was fasting for religious purposes. Walker claims that Dr. Young recorded his condition as "normal" on August, 26, 27, 28, 29 and 30. Walker's weight was recorded as 193 pounds on August 27, 192 pounds on August 28, 189 pounds on August 29, and 190 pounds on August 30. According to Dr. Young's testimony, weight loss becomes a concern when a person who is fasting loses ten percent of their weight. Young directed that blood and urine be obtained from Walker on August 27 and 28.[5] According to Walker, Dr. Young never urged him to stop fasting or exercising.

On August 26, 1995, the medical staff read Walker a form captioned, "The Effects of Starvation and Dehydration," and Walker acknowledged the form by signing it. In doing so, he attested to his understanding "that the Department of Corrections will do everything within its power to prevent the death of any person committed to its custody, and . . . this means that permission may be sought from a judge to force [an inmate] to eat or drink."

---

[4] Dr. Young purportedly recorded Walker's weight as 190 pounds.

[5] According to prison officials, medical personnel including Drs. Young and Lasky, had to devote time and resources to observing Walker in his cell. In addition, prison employees had to scrupulously keep track of the food going in and out of Walker's cell.

On August 31, 1995, after what the prison officials claim was nine days of documented refusal to eat, the Department of Corrections ("DOC") filed an *ex parte* application for a preliminary injunction in state court pursuant to Pa.R.C.P. 1531. The complaint alleged that Walker was on a hunger strike. An affidavit of Dr. Lasky dated August 30, 1995 was attached to the complaint. In that affidavit, Lasky stated that, based upon his observations earlier that day, Walker "appeared somewhat lethargic, slow walking and spoke with a slight slur." Lasky's affidavit further stated that those symptoms "could be the effects of starvation and dehydration" and that unless Walker received nutrition and hydration "as soon as possible," he could suffer "tissue breakdown . . . which may result in coma, cardiac arrest and possibly death." The affidavit also stated that feeding was required to prevent "irreparable harm." Lasky had not examined Walker before executing that affidavit, but he had spoken to Walker through his cell door. However, Walker claims that Dr. Lasky had not spoken with him and that the doctor actually confused him with another inmate.

In addition to Dr. Lasky's affidavit, the complaint alleged that Walker's "conduct threaten[ed] the good order of the SCI-Camp Hill in that other inmates may engage in hunger strikes as a result of [Walker's] conduct or may believe that [the Department] is not concerned with their well being." Other prisoners were allegedly already engaged in "copy-cat"

3

hunger strikes.[6]

The DOC also asked the state court for authorization to provide treatment including, but not limited to, nutrition, hydration, and medication, as medically necessary to preserve Walker's health and life pending the adjudication of the matter. The DOC also sought permission to involuntarily obtain specimens of bodily fluids for analysis.

On August 31, 1995, the Court of Common Pleas of Cumberland County entered an order allowing the prison officials to, *inter alia*, "involuntarily administer . . . medical treatment including but not limited to nutrition, hydration and medication as may be medically necessary to preserve [Walker's] health and life pending the adjudication of this matter, as is determined by the medical personnel duly charged with his care." The court also scheduled a hearing for September 5, 1995, and appointed counsel to represent Walker at that hearing.

Thereafter, Lasky informed Walker that the medical department had obtained a court order authorizing force-feeding. Walker claims that he told Lasky that he was fasting for religious reasons and that Lasky ignored him. A short time later, correction officers took Walker from his

cell to the prison infirmary.[7] Walker claims that he was there stripped, strapped to a hospital bed, and placed in ankle and wrist restraints. His head was also restrained, and a chest strap was used to prevent him from moving.[8] A corrections officer then read Walker the court order, and gave him a copy of it.

Walker claims that he told officials standing near his bed that he was willing to stop his hunger strike to avoid being force-fed as he was being strapped to the bed.[9] However, Lasky testified that Walker never stated he was willing to eat before he was force-fed. Rather, the prison officials testified that Lasky gave Walker the option of eating, and Walker refused. Walker claims that Auxer told him that his concession to eat came too late. In any event, after Walker was strapped to the bed, nurses placed a nasogastric tube

---

[6]It was alleged that two other prisoners, neither of whom were members of the Nation of Islam, were on hunger strikes at the same time as Walker. They were not force-fed because they ultimately agreed to eat.

[7]Walker acknowledged he was on a hunger strike when he arrived at the prison infirmary.

[8] Lasky testified that he reasonably believed that it was necessary to use restraints so that Walker: (1) would not harm himself by trying to remove or partially remove the nasogastric tube on his own; (2) necessitate another procedure to insert the tube; (3) would not harm others; and (4) so that he could more easily be observed.

[9] SMU Manager William Ward and Associate Manager Arthur Auxer were standing by Walker's bed along with Drs. Young and Lasky.

4

through his nose, down his throat and into his stomach, and Walker was then force-fed through the tube. The procedure was videotaped.

Walker claims that he was fed liquified liver and mashed potatoes with milk even though he told medical personnel that the did not eat meat or milk products because both foods upset his stomach.[10] Lasky allegedly let Walker be force-fed the foods that were being served to the general prison population for the noon meal. Lasky denies that Walker told anyone he was a vegetarian or that Walker's medical records stated that Walker was a vegetarian. However, Lasky confirms that Walker was force-fed mashed potatoes and milk.

Sometime after the force-feeding of the noon meal, Walker claims to have told medical personnel, including Lasky, that he was willing to stop his fast and that he reiterated that certain foods upset his stomach. Lasky purportedly responded by telling Walker that the feeding tube would not be removed and that Walker would be required to eat the evening meal with the feeding tube in place. When told that the evening meal would include spaghetti with meat, Walker claims to have again told Lasky that this meal would upset his stomach.

Lasky denies any intention of making Walker sick and testified that he believed the food did not pose a substantial

risk of serious harm. Walker claims that he only ate the meal under threat of force-feeding because he was in great discomfort.

Walker testified that the force-feeding made him vomit during the night and that, since he was still restrained, he choked. Walker claims that he asked Lasky to remove the feeding tube the following morning, but Lasky said that the tube would remain until after breakfast the following day. Walker also testified that he was strapped to the bed by ankle and wrist restraints throughout this period and that he was released from the restraints only for short periods during the day.

The nasogastric feeding tube was finally removed on September 2, 1995 – two days after its insertion. Lasky testified this was a reasonable period after Walker began eating on his own to insure against having to reinsert the tube, to minimize medical risks of complication, and to assure that Walker could be provided with nutrition if he again refused to eat.

Three days later, Walker and his lawyer were present at a hearing the Court of Common Pleas held on the DOC's request for authorization to force-feed Walker. During that hearing, Walker's counsel told the state court: "I would like to just add for the record, Judge, the Mr. Walker's reason for the hunger strike was to draw attention to some civil matters being addressed by Jim Flower [another lawyer representing Walker] in another civil matter and that his agreeing to an extension of the preliminary injunction in this case in no way impacts or constitutes

---

[10] Walker claims his medical records verified that he was a vegetarian.

any admission for the purposes of Mr. Flower's proceeding."

## II. DISTRICT COURT PROCEEDINGS

On March 22, 1996, Walker filed a *pro se* § 1983 complaint against Martin Horn,[11] Commissioner, Pennsylvania Department of Corrections, Jeffrey H. Beard, Deputy Commissioner, Kenneth Kyler, Superintendent SCI-Camp Hill, William Ward, Unit Manager SMU, SCI-Camp Hill, Arthur Auxer, Manager SMU (hereinafter collectively "prison officials,")[12], Martin L. Lasky, D.O.,

Medical Director, SCI-Camp Hill and William Young, M.D.,[13] physician, Medical Department, SCI-Camp Hill. Walker alleged violations of the First, Eighth and Fourteenth Amendments arising from being force-fed.[14]

The court appointed counsel for Walker and Walker thereafter filed an amended complaint. In time, the magistrate judge filed a Report and Recommendation ("R&R"), recommending granting summary judgment to Horn, Kyler, Ward, and Young on all of Walker's

---

[11]Horn was the Commissioner at the time of the filing of the complaint. He has since been replaced by Jeffrey Beard.

[12]The prison officials are represented by the General Counsel of the Commonwealth of Pennsylvania. It is unclear from Walker's brief whether the prison officials were sued in their official or individual capacities. Their brief notes:

> [I]t is understood based on conversations with [Walker's] counsel and the arguments posed by him, that this appeal is against the Secretary of Corrections in his official capacity for injunctive relief. As such, the Eleventh Amendment is not implicated. To the extent that this appeal, which clearly does not involve the personal actions of any individual Corrections

officials but the Department as a whole, requests monetary damages, it is barred by the Eleventh Amendment. Similarly, because it is understood that Walker seeks equitable relief, Corrections officials have not briefed the issue of qualified immunity, to which they would be entitled if monetary relief were sought.

Prison Officials' Br. at 3 n.1.

[13]Drs. Lasky and Young are represented by private counsel because they are not employees of the Department of Corrections. They work for medical contractors.

[14]Walker also asserted a claim under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. The district court dismissed that claim and it is not implicated in this appeal.

claims. The R&R also recommended granting Beard, Auxer and Lasky summary judgment on Walker's Fourteenth Amendment due process claim. However, the magistrate judge rejected the qualified immunity arguments of Beard, Auxer and Lasky and also recommended against dismissing Walker's First and Eighth Amendment claims under the *Rooker-Feldman* doctrine.

The district court adopted the magistrate judge's R&R with two exceptions. The district court granted summary judgment to Beard on all of Walker's claims and found that the claims for injunctive relief were moot. The district court rejected claims of lack of jurisdiction and qualified immunity of Auxer and Lasky pertaining to Walker's First and Eighth Amendment claims. Both Lasky and Auxer appealed but we dismissed the appeals for lack of appellate jurisdiction because genuine issues of material fact remained as to whether Lasky and Auxer were entitled to qualified immunity.[15] *Walker v. Horn*, 286 F.3d 705 (3d Cir. 2002).

Thereafter, Walker withdrew his claims against Auxer and the case proceeded to a jury trial involving only Dr. Lasky. The jury found that Walker was not involved in a religious fast and that Lasky had not violated Walker's constitutional

rights. The district court thereafter entered judgment in favor of Lasky. Walker then filed this appeal in which he argues that the district court erred in granting summary judgment to the defendants on his procedural due process claim and that the district court erred in admitting evidence of his prior robbery convictions pursuant to Fed.R.Evid. 609(a)(2) in the trial of his constitutional claims against Lasky.[16]

## III. DISCUSSION

### A. Our Jurisdiction to Address Walker's Procedural Due Process Claim.

Walker submits that he has a liberty interest under the Due Process Clause of the Fourteenth Amendment, and a state-created liberty interest against being force-fed.[17] He also claims that the Constitution requires procedural safeguards to ensure that a decision to force-feed someone is neither arbitrary nor erroneous, and that the prison officials and Lasky ignored those procedural safeguards.[18]

---

[15]We do have appellate jurisdiction where the district court finds that there is no qualified immunity as a matter of law. *In re Montgomery County*, 215 F.3d 367, 373-74 (3d Cir. 2000).

[16]Because no prison officials were involved in the trial, they have not briefed any issues related to the trial.

[17]State-created liberty interests are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment. *Vitek v. Jones*, 445 U.S. 480, 488 (1980) (citation omitted).

[18]Briefly, Walker argues that he should have been afforded the following procedural safeguards: the decision to obtain a state court order should have been

Before we can address the merits of Walker's constitutional claims, we must first address the parties arguments about whether the *Rooker-Feldman* doctrine deprives us of jurisdiction over those claims.[19]

---

reviewed by a committee; he should have been invited to appear in state court by telephone; all of his medical records should have been attached to the complaint; and a physician other than Lasky should have been the affiant in the state court proceeding.

[19]The district court held that *Rooker-Feldman* did not preclude it from having jurisdiction over Walker's due process claim. We exercise plenary review over the district court's application the *Rooker-Feldman* doctrine. *Parkview Assoc. P'ship v. City of Lebanon*, 225 F.3d 321, 323-34 (3d Cir. 2000). Neither the prison officials nor Lasky filed an appeal from the district court's *Rooker-Feldman* ruling. However, because their argument, if accepted, would be an alternative way of affirming the district court's decision to grant summary judgment to the prison officials and the jury verdict in favor of Lasky, they need not file an appeal to make this argument. *See Resolution Trust Co. v. Fidelity & Deposit Co. of Maryland*, 205 F.3d 615, 635 (3d Cir. 2000). Moreover, since that ruling goes to our subject matter jurisdiction, it can't be waived.

"The *Rooker-Feldman*[20] doctrine arises from 28 U.S.C. § 1257 which states in relevant part that '[f]inal judgments or decrees rendered by the highest court of a state in which a decision could be had, may be reviewed by the Supreme Court. . . .'"[21] *Valenti v. Mitchell*, 962 F.2d 288, 296 (3d Cir. 1992). "Since Congress has never conferred a similar power of review on the United States District Courts, the Supreme Court has inferred that Congress did not intend to empower District Courts to review state court decisions." *Desi's Pizza, Inc. v. City of Wilkes Barre*, 321 F.3d 411, 419 (3d Cir. 2003)(citations omitted); *see*

---

[20]The doctrine was spawned by two Supreme Court cases decided sixty years apart, viz., *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[21]In its entirety, § 1257(a) reads: "Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States."

*also Port Auth. Police Benevolent Assoc., Inc. v. Port Auth. of N.Y. and N.J. Police Dept.*, 973 F.2d 169, 179 (3d Cir. 1992) ("[T]he fundamental principle of the *Rooker-Feldman* doctrine [is] that a federal district court may not sit as an appellate court to adjudicate appeals of state court proceedings.").

"To ensure that Congress's intent to prevent the lower federal courts from sitting in direct review of the decisions of a state tribunal is given effect, the *Rooker-Feldman* doctrine prohibits District Courts from adjudicating actions in which the relief requested requires determining whether the state court's decision is wrong or voiding the state court's ruling."[22] *Desi's Pizza*, 321 F.3d at 419 (citations, internal quotations, bracket and ellipses omitted). Although § 1257 refers to orders and decrees of the highest state court, the *Rooker-Feldman* doctrine has been applied to final decisions of lower state courts as well. *Port Auth. Police Benevolent Assoc.*, 973 F.2d at 178.

Thus, "a claim is barred by *Rooker-Feldman* under two circumstances: first, if the [federal] claim was 'actually litigated' in state court prior to the filing of the federal action or, second, if the [federal] claim is 'inextricably intertwined with [the] state adjudication,' meaning that 'federal

---

[22]Habeas corpus petitions are, of course, an exception to the *Rooker-Feldman* jurisdictional bar. *Blake v. Papadakos,* 953 F.2d 68, 72 n. 2 (3d Cir.1992)(quoting *Sumner v. Mata,* 449 U.S. 539, 543-44 (1981)).

relief can only be predicated upon a conviction that the state court was wrong.'" *Desi's Pizza*, 321 F.3d at 419 (citation omitted). In either case, "*Rooker-Feldman* bars a litigant's federal claims [and] divests the District Court of subject matter jurisdiction over those claims." *Id.* at 419.

Determining whether a plaintiff "actually litigated" a federal claim in the state court for *Rooker-Feldman* purposes is not always as easy as may at first appear because *Rooker-Feldman* "has a close affinity to the principles embodied in the legal concepts of claim and issue preclusion." *Valenti*, 962 F.2d at 297. Therefore, a plaintiff cannot ordinarily litigate one constitutional claim in state court and then raise a related constitutional claim in the district court. *Id.* In *Valenti*, plaintiffs litigated an equal protection claim in state court and then sought to raise a First Amendment claim in the district court. We held that *Rooker-Feldman* deprived the district court of subject matter jurisdiction to adjudicate the First Amendment claim. We explained:

> [Plaintiffs] each had an opportunity to raise a first amendment challenge [in state court] and failed to do so. They cannot be allowed to escape *Rooker-Feldman* by raising a new constitutional theory in federal court. Under principles of claim preclusion, they had a full and fair opportunity to litigate their first amendment

claim in the state court, and here they merely seek a second bite at the apple.

*Valenti*, 962 F.2d at 296.

A federal claim is "inextricably intertwined" with an issue adjudicated by a state court when: (1) the federal court must determine that the state court judgment was erroneously entered in order to grant the requested relief, or (2) the federal court must take an action that would negate the state court's judgment. *Desi's Pizza*, 321 F.3d at 421 "In the first circumstance . . . *Rooker-Feldman* bars the plaintiff's federal claim because granting the plaintiff relief would require the federal court to conclude that the State Court made an incorrect factual or legal determination. In cases falling into this category, federal relief can only be predicated upon a conviction that the state court was wrong." *Id.* (citation and internal quotations omitted). That inquiry requires that we identify the pillars on which the state-court judgment rests. "To do this, we consider the questions of state law that the state court was obligated to reach in order to render its decision." *Id.* In the second situation discussed above, "the plaintiff's federal claim is precluded because the relief sought would undo or prevent the enforcement of the state court's order." *Id.* at 422. In other words, "*Rooker-Feldman* does not allow a plaintiff to seek relief that, if granted, would prevent a state court for enforcing its orders." *Id.*

Here, prison officials argue that

Walker's procedural due process claim is, in essence, a request to a lower federal court to review a state court injunction authorizing the prison officials to force-feed Walker. They claim that a finding in Walker's favor on his procedural due process claim would necessarily be a federal ruling that the state court order was wrong. They are thus claiming, in *Rooker-Feldman* terminology, that Walker's due process claim is "inextricably intertwined" with the state court adjudication. Therefore, say the prison officials, the procedural due process claim is barred by *Rooker-Feldman* and the district court lacked subject matter jurisdiction over that claim.

In making this argument, they rely heavily on *Port Authority Police Benevolent Association, Inc. v. Port Authority of New York and New Jersey Police Department*, 973 F.2d 169 (3d Cir. 1992). There, the Port Authority obtained an injunction from a state court prohibiting a nonprofit organization employed by the Police Benevolent Association from soliciting contributions from Port Authority tenants. In state court, the Police Benevolent Authority unsuccessfully argued that solicitation was protected speech under the First Amendment and that the Port Authority regulations prohibiting soliciting tenants violated its First Amendment rights.

The Police Benevolent Association then went to federal court and asserted the same constitutional claim they had asserted in the state court action. They asked the district court for an injunction preventing

10

the Port Authority from enforcing its antisolicitation regulations. The Association conceded that the federal injunction would effectively enjoin the enforcement of the state court's injunction if granted, and the district court abstained under *Younger v. Harris*, 401 U.S. 37 (1971). On appeal, we held that the district court properly abstained under *Younger*, but also noted that the district court could have dismissed the complaint pursuant to *Rooker-Feldman* because assertion of jurisdiction over the compliant would have required the district court to decide issues that were "inextricably intertwined" with the state court's decision. 973 F.2d at 177.

The prison officials argue that *Port Authority Police Benevolent Association* controls because *Rooker-Feldman* prevents the district court from ruling on the propriety of the state court order allowing Walker to be force-fed. Walker counters by arguing that his procedural due process claim does not require the district court to review the propriety of the state court injunction or to find that the state court's decision was wrong. Admittedly, Walker's due process claim is not a frontal attack on the propriety of the state court order. However, it nevertheless questions the propriety of the state court's order. Walker's constitutional claim is bottomed on his theory that the prison officials had inadequate procedural safeguards to insure that the state court's ruling would be based upon accurate and complete information. Walker correctly claims that the state court's order was based exclusively on Lasky's affidavit. However, says Walker,

Lasky never examined him and, in fact, confused him with another prisoner. Moreover, says Walker, the complaint seeking state injunctive relief did not include an affidavit from Dr. Young, who had examined him several times, or a copy of relevant medical records. In Walker's view, had there been a Department of Corrections requirement that his medical records and an affidavit of his treating physician be attached to the complaint, the state court would have learned that Walker was being examined by a physician on a daily basis, was not dehydrated, sustained no weight loss between August 26 and August 30, 1995, and was otherwise in good health. However, says Walker, because of the lack of procedural safeguards, the state court record lacked the information necessary to guarantee that the state court's decision was not arbitrary or erroneous. He writes: "Had minimal procedural safeguards been provided, the state court would have learned that the affidavit [of Lasky] was incorrect and that force-feeding was not warranted because Mr. Walker's treating physician had concluded that Mr. Walker was in good health." Walker's Br. at 14.

In our view, Walker is simply saying that the state court's decision was wrong and blaming the error on certain alleged procedural deficiencies.

For example, Walker argues:

[b]ecause Dr. Lasky never examined Mr. Walker and, . . . confused [him] with another inmate . . . important statements in [Lasky's] affidavit were erroneous . . . As a result, the state court was completely

misled . . . Had Mr. Walker been given notice and the opportunity . . . to participate in the proceeding, the state court would have learned that statements in Mr. Lasky's affidavit were erroneous. Moreover had DOC regulations required defendants to attach to their application for . . . *ex parte* relief a copy of Mr. Walker's medical records or an affidavit from the treating physician, it would have been immediately apparent to the state court that Dr. Lasky's affidavit was incorrect.

Walker's Br. at 16-17

Walker is clearly claiming that had he been given adequate procedural due process, the state court would not have entered an erroneous order to force-feed him. Thus, Walker's due process claim is "inextricably intertwined" with the state court adjudication. He cannot prevail on his procedural claim unless we pull the thread that will unravel the constitutional fabric of the state court's order. Consequently, *Rooker-Feldman* bars Walker's due process claim and the district court had no subject matter jurisdiction over it. Accordingly, we need not address Walker's argument that the district court erred by granting summary judgment to the defendants on his procedural due process claim.[23]

---

[23]Walker argues that because we have repeatedly held that *Rooker-Feldman* applies only to "final decisions" of state courts, *see, e.g., FOCUS v. Allegheny*

## B. Admission of Robbery Convictions.

As noted earlier, as a result of the district court's summary judgment rulings and Walker's withdrawal of claims against Auxer, Walker's only remaining claims were his claims that Lasky violated his First and Eighth Amendment rights, and the jury returned a verdict in Lasky's favor on those claims.[24]

---

*County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996), it cannot bar his due process claim because there was no final decision by a state court. Rather, there was only a preliminary injunction, which, under Pennsylvania law, is not a final merits decision, but a temporary remedy granted until a dispute can be completely resolved. Reply Br. at 4. However, this contention ignores that we have held that the doctrine also applies where a state court issues a preliminary injunction because "the preliminary injunction issued by [the state court] resolve[s], at least for the moment, the dispute between the parties that forms the basis of the federal complaint." *Port Auth. Police Benevolent Assoc.*, 973 F.2d at 178.

[24]As noted in n.13 *supra*, Lasky is not an employee of the DOC. He is an employee of a private medical organization under contract to provide medical services to the inmates at SCI-Camp Hill. Nonetheless, the Supreme Court has held that a physician who is under contract to provide medical services to inmates at a state prison acts "under color of state law" for § 1983 purposes. *West v. Atkins*, 487 U.S. 42, 54 (1988).

12

During the trial, Lasky's counsel sought to introduce evidence of Walker's prior record to impeach his credibility. In the ten year period before the trial, Walker had been convicted of two charges of simple assault, four firearms violations, one charge of terroristic threats and nine robberies. Lasky's counsel referred to these convictions in his opening statement. Later, Walker moved to exclude the convictions pursuant to Fed.R.Evid. 609(a)(1).[25] In a two-part ruling, the district court granted Walker's motion with respect to the convictions for assault, firearms violations and terroristic threats, finding that the probative value of the convictions was outweighed by the danger of unfair prejudice. However, the district court held that, because the crime of robbery involves dishonesty within the meaning of Fed.R.Evid. 609(a)(2), the court was "without discretion to weigh the prejudicial effect of the proffered evidence against its value" and, therefore, "evidence of the [robbery] conviction is automatically admissible for impeachment purposes." App. at 8.

Fed.R.Evid. 609 provides, in relevant part:

> (a) **General rule.** For the purposes of attacking the

credibility of a witness,

> (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, . . . .; and

> (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

Fed.R.Evid. 609(a). Therefore, "if the prior conviction involved dishonesty or false statements, the conviction is automatically admissible insofar as the district court is without discretion to weigh the prejudicial effect of the proffered evidence against its probative value." *Walden v. Georgia-Pacific, Inc.*, 126 F.3d 506, 523 (3d Cir. 1997). "Because Rule 609(a)(2) does not permit the district court to engage in balancing, . . . Rule 609(a)(2) must be construed narrowly to apply only to those crimes that bear on a witness' propensity to testify truthfully." *Id.* (citation omitted).

Walker contends that the district court erred by holding that robbery is a

---

[25]Walker's counsel admits that he initially conceded that the robbery convictions were admissible; however, before the second day of trial began, counsel changed his mind and argued that they were not admissible. Walker's Br. at 30 n.15.

crime involving dishonesty, and that the district court therefore erred in allowing counsel to use his robbery convictions for impeachment purposes.[26] In support of that argument, he cites to the original Conference Committee Report which spoke of the types of crimes contemplated by subsection (a)(2):

> By the phrase "dishonesty and false statement" the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of *crimen falsi*, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.

H. R. Conf. Rep. No. 1597, 93d Cong., 2d Sess. 9, *reprinted in* 1974 U.S.C.C.A.N. p. 7051, 7058, 7103. He then refers to the Advisory Committee note following the 1990 amendment to Rule 609(a)(2) which reads:

> The Advisory Committee concluded that the

Conference Report provides sufficient guidance to trial courts and that no amendment [to the dishonesty and false statement provision] is necessary, notwithstanding some decisions that take an unduly broad view of "dishonesty" admitting convictions such as for bank robbery or bank larceny.

Fed.R.Evid. 609 Advisory Committee Note to 1990 amendment. In light of these statements, Walker submits that crimes involving dishonesty are limited to the types of crimes explicitly detailed in the two statements above and this excludes robbery because it is not a crime involving dishonesty.

It is somewhat surprising that we have not yet decided whether robbery involves dishonesty within the meaning of Rule 609(a)(2). However, in a case decided before the effective date of the Federal Rules of Evidence, we did hold that petit larceny is not a *crimen falsi* crime. In *Government of the Virgin Islands v. Toto*, 529 F.2d 278 (3d Cir. 1976), we wrote:

> The term *crimen falsi* has roots in the common law doctrine that persons convicted of certain kinds of crimes were disqualified from testifying. While the doctrine of testimonial

---

[26]The construction of Rule 609 is an issue of law over which we have plenary review. *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 522 (3d Cir. 1997).

14

disqualification has withered from our law, the term *crimen falsi* has retained vitality in the context of impeachment. The established law in this circuit is that a witness may be impeached by evidence of a prior conviction only if it is for (a) a felony or (b) a misdemeanor in the nature of *crimen falsi*. The specific contours of *crimen falsi* are uncertain. *Crimen falsi* describes crimes involving, or at least relating to, **communicative, often verbal, dishonesty**; we have said that they are crimes which touch on the honesty of the witness. For our purposes here, we have no difficulty in accepting the government's formulation of the concept: "Although the term '*crimen falsi*' has been subject to many definitions, the generally accepted scope of the term would be crimes that are in the nature of perjury, criminal fraud, embezzlement, false pretense or any other offense the commission of which involves some element of untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." Absent special circumstances, as the district court so aptly put it: "Petit larceny is just not that."

*Id.* at 281 (citations omitted) (emphasis added). However we also noted that, in certain cases, petit larceny may be a *crimen falsi* crime. We explained: "It is conceivable that a conviction for petit larceny might subsume a crime in the nature of *crimen falsi*, e.g., 'petit' stealing by false pretenses." *Id.* In a case decided after the effective date of the Federal Rules of Evidence, we held that a crime must involve expressive dishonesty to be admissible under Rule 609(a)(2). In *Cree v. Hatcher*, 969 F.2d 34, 38 (3d Cir. 1992), we stated: "The proper test for admissibility under Rule 609(a)(2) does not measure the severity or reprehensibility of the crime, but rather focuses on the witness's propensity for falsehood, deceit or deception." Applying that teaching here, we readily conclude that, although robbery is certainly a very serious crime, it does not involve communicative or expressive dishonesty. Therefore, the district court erred by holding that robbery is a crime involving dishonesty that is automatically admissible under Rule 609(a)(2).[27]

---

[27] The Model Penal Code states: "an individual commits robbery if in the course of committing a theft he inflicts or threatens injury, or commits or threatens to commit a felony. . ." *U.S. v. Williams*, 344 F.3d 365, 375 (3d. Cir. 2003) (internal quotation marks omitted). One can

Of course, that does not end our inquiry. Under Fed.R.Evid. 103(a), admitting Walker's robbery convictions for impeachment is not reversible error "unless a substantial right of a party is affected." Our standard of review of a district court's nonconstitutional error allows us to find an error harmless only if it is highly probable that the error did not affect the outcome of the case. *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 917 (3d Cir. 1985).

Not unexpectedly, Walker argues that the admission of his robbery convictions was not harmless error because his credibility was central to his ability to prove his claim that Lasky violated his First and Eighth Amendment rights. He reminds us that he was the only witness who testified that he is a practicing member of the Nation of Islam and that he was engaged in a religious fast when he was forcibly fed. He was also the only witness who testified that, contrary to Lasky's affidavit, he gave a blood and urine sample as ordered by Dr. Young.[28] Finally, his testimony also provided the only evidence that he had never been offered a liquid

protein supplement by Lasky.[29] Therefore, according to Walker, the evidence of his robbery convictions significantly undermined his credibility. He argues: "the only reasonable explanation for the jury finding that [he] failed to prove he was engaged in a religious fast was that he was not, in their minds, a credible witness." Walker's Br. at 37.

Walker stresses that his lack of credibility was the central theme of Lasky's counsel's closing argument.[30] According to Walker, Lasky's counsel argued that Walker's testimony about the religious basis of his fast was simply not credible. Rather, argued Lasky's counsel, Walker just did not want Dr. Young, who examined him daily, to interfere with his hunger strike, and Walker therefore used the magic words "religious fast." Walker also contends that Lasky's counsel argued that even though Walker told Dr. Young that he was on a religious fast and Dr. Young noted this in the medical records on August 26, Dr. Young had no independent verification that the fast was religious and that Walker's statement could not be taken at face value.

Lastly, and finally, Walker contends that Lasky's counsel told the jury that they needed to consider Walker's credibility

---

obviously commit a theft without employing deceit (i.e. a pickpocket). Therefore, the theft that is required for robbery does not transform that crime of violence into a *crimen falsi* crime.

[28]Lasky's affidavit recites that Walker refused to permit a physician to obtain blood and urine samples for analysis to determine his condition.

[29]Lasky's affidavit recites that Walker refused a liquid protein supplement.

[30]However, Walker does not claim that Lasky's counsel's closing argument was improper.

while deliberating reminding them that Walker had been "convicted of crimes of dishonesty nine times, the robberies." In Walker's telling, because the robbery convictions were central to Lasky's efforts to discredit his testimony, the introduction of the convictions was not harmless.

Lasky contends that, given the very limited use of the robbery convictions and the amount of other evidence bearing on Walker's credibility, it is highly improbable that the robbery convictions affected the outcome of Walker's case at all. Moreover, says Lasky, since Walker testified on direct examination that he was residing at SCI-Camp Hill at the time of the incident eight years earlier, and was currently residing at SCI-Pittsburgh, the jury had to have known that Walker had a significant criminal record that included convictions for serious crimes. Further, says Lasky, during cross-examination, Walker mentioned a third prison, SCI-Smithfield, where he had been incarcerated. In Lasky's view, given the small amount of time spent on the actual impeachment and the fact that Walker testified that he had been incarcerated in three different prisons over at least the previous eight years, any prejudice from the robbery convictions was inconsequential.

Lasky next refers us to the significant amount of other evidence regarding Walker's credibility. According to Lasky, even Walker's religious motive for fasting is something of a red herring. No mention was made of a religious fast during argument over the preliminary injunction in the state court. In fact, Walker's counsel in the state court said the fast was not religious at all, but was an attempt to focus attention on Walker's then pending litigation. Lasky supports this with evidence that a friend and fellow litigant of Walker's, Darrel Alston, engaged in a hunger strike and was not a member of the Nation of Islam.

Lasky cites evidence corroborating his contention that Walker's motives were not religious. As we noted earlier, just before Walker stopped eating, he had an argument with the guards over access to his legal materials. He was written up for misconduct and put on further restriction. Walker had five civil and two criminal cases pending at the time, and access to his legal materials was therefore important to him. Prison policy allowed only one box of legal materials in his cell at any one time, and the rest had to be kept in storage.[31] Lasky claims this policy was the reason for the argument and Walker went on a hunger strike in protest, that he now seeks to redefine as a religious fast.

Lasky notes the conflicting evidence about when Walker would fast, the number of years he had engaged in fasts and the average duration of his fasts. The evidence of fasting was first once or twice a month, then every weekend, then for three days or as long as fifteen days. Walker's trial testimony was different than his deposition, and that was different than allegations in

---

[31]Walker could trade at any time to get different materials, but was limited to one box at a time.

his amended complaint. There was also a discrepancy about when Walker became a member of the Nation of Islam.

Walker testified on direct examination that he was forced to eat and drink milk which made him ill. He also testified that he was a vegetarian, but admitted on cross-examination that he ate meat, just not red meat, and never notified the prison that he was vegetarian although he claims his medical records state that he was. He testified that he could not have milk for health reasons, but on cross-examination admitted that no one ever told him that he was lactose intolerant. In fact, argues Lasky, there was a video of Walker voluntarily drinking milk with breakfast. Not only did Walker not get sick, he asked for more milk. Finally, Walker testified that he told Lasky and the prison officials that he would eat, but later admitted that he had not eaten when given the opportunity.

According to Lasky, given this stream of contradictions, the admission of the robbery convictions was harmless. Lasky argues: "It is counterintuitive to think that the passing reference to Mr. Walker's robbery convictions, in light of the jury's knowledge of three prison stays over at least the past eight years, affected the outcome in light of all of the other evidence elicited at trial." Lasky's Br. at 24. We agree. Walker's own testimony that he had been incarcerated in three state prisons certainly informed the jury that he had a substantial criminal record. There was also a substantial amount of other evidence that affected Walker's credibility as noted above. Therefore, it is highly improbable that the error in admitting the robbery convictions had an impact on the outcome of the trial.[32]

## C. Collateral estoppel.

One small matter remains. Lasky argues that Walker's First and Eighth Amendment claims are barred by the doctrine of collateral estoppel or issue preclusion.[33] We disagree. "Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982) (citation omitted). "It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra*

---

[32]We also note that the jury may well have entertained other doubts about the nature of Walker's fast. He testified to fasting from August 25th to August 30th. Yet, he weighed 190 pounds on the 25th and still weighed 190 pounds after five days of fasting. Moreover, after two days of fasting, on August 27th, he actually gained three pounds.

[33]The terms "collateral estoppel" and "issue preclusion" are frequently used interchangeably. *See Burlington N. R.R. v. Hyundai Merchant Marine, Co. Ltd.* (3d. Cir. 1995). 63 F.3d 1227, 1231, n.2. We will refer to the doctrine as "collateral estoppel."

*v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). Under Pennsylvania law, the following conditions must exist before collateral estoppel may be invoked: (1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action. *Shuder v. McDonald's Corp.*, 859 F.2d 266, 273 (3d Cir. 1988). It is readily apparent that the first requirement for collateral estoppel is not met here. The only issue decided in the state court was whether Walker would suffer irreparable harm if he were not force-fed. The issue in the district court was whether Lasky violated Walker's constitutional rights by force-feeding him. Those issues are obviously not identical. Therefore, Walker's constitutional claims against Lasky are not barred by collateral estoppel. They nevertheless fail for the reasons we have explained.

### IV.

For the above reasons, we will affirm the judgment of the district court.